Ivon Ray STANLEY, Plaintiff-Appellant,

v.

Walter D. ZANT, Warden Georgia Diagnostic and Classification Center, Defendant-Appellee.

No. 81–7615.

United States Court of Appeals, Eleventh Circuit.

Feb. 10, 1983.

Rehearing and Rehearing En Banc Denied May 3, 1983.

Clark, Wulf, Levine & Peratis, Melvin L. Wulf, New York City, Neil Bradley, American Civil Liberties Union Foundation, Atlanta, Ga., for plaintiff-appellant.

Daryl A. Robinson, Asst. Atty. Gen., Atlanta, Ga., for defendant-appellee.

Before FAY, VANCE and ARNOLD [*], Circuit Judges.

VANCE, Circuit Judge:

Ivon Ray Stanley was convicted in the Decatur County, Georgia Superior Court of murder, armed robbery and kidnapping with bodily injury and sentenced to death.

On April 12, 1976 Stanley and his codefendant, Joseph Thomas, robbed the victim at gunpoint, took him to the woods, struck his head with a hammer, tied him to a tree, made him lie in a shallow grave, beat and jabbed him with a shovel in the head, throat and chest, shot him in the head and buried him alive while he was still pleading with Stanley and Thomas to stop. Several weeks before the crime the defendants were overheard plotting the robbery. One witness overheard Stanley remark that after the robbery the best thing to do is to "get rid of him."

The Georgia Supreme Court affirmed Stanley's convictions and death sentences for murder and kidnapping with bodily injury. *Stanley v. State,* 240 Ga. 341, 241 S.E.2d 173 (1977), *cert. denied,* 439 U.S. 882, 99 S.Ct. 218, 58 L.Ed.2d 194 (1978). The court vacated his armed robbery conviction, holding that it was included in the felony murder charge. *Id.,* 240 Ga. at 343, 241 S.E.2d at 176.

Stanley filed a petition for state habeas corpus in the Butts County Superior Court. An evidentiary hearing was held on March 28, 1979, and Stanley was afforded full opportunity to present evidence. He testified and called six other witnesses. All of this testimony related to Stanley's contention that he was denied the effective assistance of counsel in violation of his sixth and fourteenth amendment rights. His petition was denied on July 26, 1979. Certificate of probable cause for appeal to the Georgia Supreme Court and petition for certiorari to the United States Supreme Court were denied. *Stanley v. Zant,* 444 U.S. 1103, 100 S.Ct. 1068, 62 L.Ed.2d 788 (1980). He filed a second state habeas petition in superior court but, with one exception, the court held that the petition presented grounds which could have been presented earlier and were therefore waived. The state court considered one ground, a claim that the jury instructions violated *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), on the merits. The second petition.

[*] Honorable Richard S. Arnold, U.S. Circuit Judge for the Eighth Circuit, sitting by designa-

tion was denied on October 14, 1980, after which Stanley filed his petition in district court.

The district court found that Stanley had been given a full and fair hearing in state court and that such findings were fully supported by the record. It concluded that Stanley was not entitled to a federal evidentiary hearing and denied the petition. Stanley now appeals that judgment.

On appeal to this court Stanley presents four contentions: (1) that he was denied the effective assistance of counsel by his appointed lawyer's failure to present any evidence of mitigation in the penalty phase of trial; (2) that the jury instructions violated *Godfrey;* (3) that his incriminating statement was improperly received in evidence; and (4) that imposition of the death penalty where there was no purpose to cause the victim's death is unconstitutional. We will consider the contentions in the order presented.

(1)

Stanley asserts that the only theory available to defense counsel that might have saved his client from the death penalty was that Stanley did not participate in the actual torture slaying but that he rather attempted to persuade Thomas to let the victim live. Stanley so testified at the guilt phase of the trial. Defense counsel produced no character evidence that might have made the theory more credible, nor did counsel produce any corroborative character evidence to supplement Stanley's own testimony about his background and personal history. At the state habeas hearing, Stanley's mother, his grandmother, his brother, two second cousins, and an old family friend testified on his behalf about his character and personal history. Stanley argues that by failing to present any of this evidence in mitigation, even though these competent witnesses were easily obtainable and willing to testify, and by failing to explore the possibilities, his trial counsel failed to provide the minimally effective assistance of counsel required by the sixth amendment.

The framework for analyzing claims of constitutionally ineffective assistance of counsel in this circuit was set forth in the en banc opinion in *Washington v. Strickland,* 693 F.2d 1243 (5th Cir.1982) (Unit B en banc). Under *Washington v. Strickland,* a petitioner asserting that counsel failed to conduct an adequate pretrial investigation has the initial burden of making a dual showing. As a threshold requirement, he must show that his counsel was in fact ineffective, that counsel's conduct was not within the "range of competence demanded of attorneys in criminal cases." *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970); *Mylar v. State,* 671 F.2d 1299, 1301 (11th Cir.1982), *petition for cert. filed,* 50 U.S.L.W. 3984 (U.S. June 7, 1982) (No. 81–2240). This is an objective assessment of whether trial counsel fell below acceptable professional standards in not advocating the underlying claim. This portion of the analysis may ask, for example, whether counsel conducted a reasonable pretrial investigation and whether counsel's failure to investigate certain lines of defense was part of a strategy based on reasonable assumptions. A petitioner has the additional burden of proving that his counsel's ineffectiveness caused "actual and substantial prejudice" to his case. Because we hold that Stanley has failed to prove that his trial counsel was ineffective, we need not reach the issue of prejudice.

Petitioner's ineffectiveness argument proceeds on two levels. Stanley first contends that the Supreme Court's death penalty cases require that the sentencing authority consider all available aspects of the character and personal history of the defendant. From this proposition flows the logically necessary corollary that counsel's failure to present any evidence in mitigation constitutes per se ineffective assistance. Should this absolutist position prove unavailing, Stanley adopts the fallback argument that, under the facts of this particular case, counsel's failure to offer evidence in mitigation rose to the level of ineffec-

tiveness. While we have no difficulty rejecting Stanley's initial position, we are more concerned by Stanley's allegations of ineffective assistance of counsel under the specific circumstances of his case.

Stanley argues initially that the Supreme Court decisions in *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); and *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), require a rule creating an absolute duty to investigate and present mitigating character evidence in every capital case. His reliance on these cases is misplaced. The plurality in *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), concluded that the sentencing process must allow consideration of the "character and record of the individual offender and the circumstances of the particular offense." 428 U.S. at 304, 96 S.Ct. at 2991.[1] The Court held unconstitutional the mandatory death penalty statute used in North Carolina, which failed to allow any such consideration. The opinion did not address the duty of counsel to present such testimony, nor did it suggest that counsel's strategic decision not to present such evidence would be deemed per se unreasonable.

The Supreme Court elaborated on *Woodson* in *Lockett v. Ohio.* The Ohio death penalty statute did not permit the sentenc-ing judge to consider, as mitigating factors, Lockett's character, prior record, age, lack of specific intent to cause death, or her relatively minor part in the crime. The *Lockett* plurality concluded that in all but the rarest kind of capital cases, the eighth and fourteenth amendments require that the sentencer "not be *precluded* from considering, as a *mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the *defendant proffers* as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. at 604, 98 S.Ct. at 2964 (emphasis partially added) (footnote omitted). This result was necessary because "a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." *Id.* at 605, 98 S.Ct. at 2965. *Lockett,* when combined with cases such as *Gregg v. Georgia,* 428 U.S. 153, 198, 96 S.Ct. 2909, 2936, 49 L.Ed.2d 859 (1976) (holding that the discretion of the sentencer must be guided by "objective standards so as to produce nondiscriminatory application"), means that the sentence of death may only be proper under a system allowing guided individualization.[2]

The *Lockett* holding that the sentencer must give "independent mitigating weight"

---

1. The *Woodson* plurality explained:

 A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.
 ... While the practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circum-stances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (citation omitted).

2. The *Lockett* requirement of individualized sentencing had its genesis in the death penalty cases decided by the Supreme Court on July 2, 1976: *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929; *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944.

 [T]he plurality [in the 1976 cases] held that the fundamental respect for humanity identified in *Gregg* as the source of substantive requirements also indispensably requires consideration of the character and record of the individual defendant and the circum-

to factors not included in the statutory list[3] was recently reaffirmed in *Eddings v. Oklahoma,* 455 U.S. 104, 110–15, 102 S.Ct. 869, 874–76, 71 L.Ed.2d 1 (1982). *Eddings* introduced in mitigation "substantial evidence . . . of his troubled youth" and emotional disturbance. *Id.* at 107, 102 S.Ct. at 872. The Supreme Court reversed the sentencing judge's refusal to consider this evidence in mitigation, stating that "[b]y holding that the sentencer in capital cases must be permitted to consider any relevant mitigating factor, the rule in *Lockett* recognizes that a consistency produced by ignoring individual differences is a false consistency." *Id.* at 112, 102 S.Ct. at 875.

■■■■■ These cases establish that, subject only to the loose evidentiary requirement of

relevance, capital defendants have a right to offer any evidence they choose on character or record or circumstances of the offense. Further, a death penalty scheme must allow the sentencing authority to consider and give independent weight to mitigating factors in addition to those listed in the death penalty statute. The cases thus create an asymmetry weighted on the side of mercy: while a sentencing authority may consider only those *aggravating* circumstances listed in the relevant statute, *Proffitt v. Wainwright,* 685 F.2d 1227, 1266–70 (11th Cir.1982), it may consider any *mitigating* factors that it wishes.[4]

Although we give full recognition to the rule of *Woodson, Lockett* and *Eddings* that

stances of his offense. It applied this preliminary holding by determining whether each statute had a mechanism whereby a defendant could bring individualized information to the attention of the sentencing authority. The statutes found constitutional all permitted consideration of any mitigating circumstances the defendant might seek to establish, while those held unconstitutional failed to provide for consideration of the character and record of the individual defendant. Liebman & Shepard, *Guided Capital Sentencing Discretion Beyond the "Boiler Plate" Mental Disorder as a Mitigating Factor,* 66 Geo. L.J. 757, 772 (1978) (footnotes omitted). *See also Jurek,* 428 U.S. at 271, 96 S.Ct. at 2956; *Proffitt,* 428 U.S. at 250–52, 96 S.Ct. at 2965–66; *Gregg,* 428 U.S. at 189, 196–97, 96 S.Ct. at 2932, 2936. Two years later, the Court in *Lockett* compared the Ohio statute with the statutes upheld in *Gregg, Proffitt* and *Jurek,* noting that none of the three death penalty statutes sustained in 1976 "clearly operated at that time to prevent the sentencer from considering any aspect of the defendant's character and record or any circumstances of his offense as an independently mitigating factor." 438 U.S. at 607, 98 S.Ct. at 2965.

3. *See, e.g., Washington v. Watkins,* 655 F.2d 1346, 1375 (5th Cir. 1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982):

The fatal flaw in *Lockett* was not the exclusion of evidence relating to nonstatutory mitigating factors, but the limitation on the sentencer's consideration of that evidence except as it related to the statutory mitigating factors.

Two commentators wrote of *Lockett:*

The vice of the Ohio statute was that the sentencing authority could consider mitigating factors such as the defendant's age, mi-

nor role in the offense, and lack of specific intent to cause death only if they shed light on one or more of the statutory mitigating circumstances. Thus, they could not in themselves affect the sentencing determination. Even though the sentencing authority could hear the mitigating evidence, the structure of the sentencing procedure prevented the sentencer from giving independent mitigating weight to the proffered aspects of character, record, and offense.

The *Lockett* decision thus resolved the ambiguity in the 1976 Death Penalty Cases and made clear that a capital defendant has an eighth amendment right to a sentencing authority with the power to consider any and all aspects of the defendant's character, record, and offense that the defendant wishes to proffer as mitigating circumstances. The *Lockett* decision thus does more than merely expand the number of factors that must be considered by a capital sentencing authority; it alters the process by which that authority must consider those factors. The real significance of the decision lies in its requirement that the sentencer give all mitigating factors offered by the defendant independent mitigating weight. Hertz & Weisenberg, *In Mitigation of the Penalty of Death: Lockett v. Ohio and the Capital Defendant's Right to Consideration of Mitigating Circumstances,* 69 Calif.L.Rev., 317, 326, 332 (footnotes omitted). *See also* Gillers, *Deciding Who Dies,* 129 U.Pa.L.Rev. 1, 32–39 (1980) (arguing that the message of *Lockett's* "independent weight" request is that the legislatures may no longer tell the sentencing body how to treat the mitigating evidence that it does receive).

4. As the fifth circuit explained in *Washington v. Watkins:*

Equally as important may be the jury's subjective, unarticulable perceptions of

the eighth and fourteenth amendments require defendants to have the opportunity to present any evidence in mitigation, we cannot draw from these cases a corresponding duty on defense counsel to present general character evidence in every capital case. Acknowledgement of the importance of character testimony and the right to have it considered by the sentencing body when presented does not of itself speak to the duty of counsel. As we discuss below, the posture of a given case may well justify, if not require, an effective attorney to *refrain* from presenting such evidence.

■ For similar reasons, the fifth circuit en banc court recently rejected an argument closely related to that advanced by Stanley:

> [In addition to ineffective assistance of counsel,] Washington also argues that

Washington. In their separate opinions in *Lockett,* Justices White and Rehnquist argued that the plurality was returning to the unguided jury discretion condemned in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)....

However, the *Gregg* plurality was careful to note that "[n]othing in any of our [death penalty cases] suggests that the decision to afford an individual defendant mercy violates the Constitution." 428 U.S. at 199, 96 S.Ct. at 2937. The exercise of mercy, of course, can never be a wholly rational, calculated, and logical process. From these premises, other commentators have argued that "*Lockett* is entirely consistent with *Furman* and the 1976 Cases, because it grants broad sentencer discretion only on the mitigating and not on the aggravating side of the sentencing equation." Hertz & Weisberg, [*supra*]. To amplify:

The *Gregg* decision essentially holds that the state cannot execute a defendant unless it establishes, according to constitutionally sufficient criteria of aggravation and according to constitutionally mandated procedures, that capital punishment is appropriate for that defendant. Nothing in *Gregg,* however, requires the state to execute defendants for whom such a finding is made. The sentencing authority can find that mitigating circumstances established by defense evidence outweigh such aggravating factors. It can also invoke whatever standards it wishes—objective or otherwise—to nullify the significance of any state proof of aggravation. *Id.* at 375 (footnote omitted). In this view, *Lockett* does indeed create an asymmetry in the channeling of jury sentencing discretion.

[counsel's] failure to investigate and present character evidence rendered the imposition of the death penalty unconstitutional under *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In *Lockett* the Supreme Court struck down a procedure which prevented the sentencer from considering aspects of the defendant's character and record as nonstatutory mitigating factors. *Id.* at 604, 98 S.Ct. at 2964. As noted by the court in *Washington v. Watkins,* the Supreme Court cases on the death penalty deal with "procedural flaw[s] in the system of justice," not with alleged flaws in the judgment of counsel. 655 F.2d at 1356. Therefore, [counsel's] failure to investigate or present extensive character evidence does not render the imposition of the death penalty unconstitutional.

> That asymmetry is offensive, however, only if one assumes that the grant of mercy to some based on their particularized circumstances, somehow abridges the constitutional rights of others whose particular circumstances do not inspire mercy. It may well be that the *Lockett* plurality does not share that assumption with Justices White and Rehnquist.

655 F.2d at 1376 n. 57. Hertz & Weisberg, *supra* note 3, conclude that "there is a central distinction for eighth amendment purposes between the decision to impose a death sentence and the decision to afford mercy." *Id.* at 375. *But see* Gillers, *supra* note 3, at 29, 30 (arguing that perhaps "recognizing that an 'arbitrariness' theory is useful at the fringes, but weaker at the core, *Lockett* shifted the inquiry from the avoidance of arbitrariness to what may be called its opposite, the recognition of 'uniqueness' ... *Lockett,* while acknowledging the arbitrariness analysis of *Furman* and *Gregg* (insofar as it relied on *Furman*), had to sidestep both"); Berns, For Capital Punishment 184 (1979) ("Thus, having begun in 1972 in *Furman v. Georgia* by complaining of the capriciousness of the sentences imposed in capital cases and suggesting that to prevent this capriciousness statutes must limit the distinction available to judges or juries when imposing sentences, the Court [in *Lockett*] ... has now begun to complain of, in effect, the absence of discretion. As a result, we are likely to see more of what the Court calls 'capriciousness' ").

*Washington v. Strickland,* 693 F.2d at 1250 n. 12. We thus agree with the state habeas court's conclusion in the present case that "[*Lockett*] does not require that any particular kind of mitigating evidence be presented in order for the sentence of death to be constitutional." First state habeas hearing, *Stanley v. Zant,* No. 4186, slip op. at 3–4 (Super.Ct. of Butts County, Ga. March 6, 1981).

Our inquiry cannot end, however, with the determination that Stanley is wrong in asserting that failure to present any additional evidence at the penalty stage constitutes per se ineffective assistance of counsel. Stanley's attorney may still have been ineffective, under the circumstances of this case, in not presenting character evidence that he had the power to present under *Woodson, Lockett* and *Eddings.* This requires application of the general principles governing effectiveness of counsel to the specific context of a capital sentencing proceeding.

■ The legal standard for judging effective assistance of counsel is easier to state than to apply. The black letter law in this circuit informs us that the counsel to which Stanley was entitled under the sixth amendment was a counsel reasonably likely to render and rendering reasonably effective assistance given the totality of the circumstances. *See, e.g., Herring v. Estelle,* 491 F.2d 125, 127 (5th Cir.1974). Stanley does not contend that his attorney was not "likely to render" effective assistance or that counsel suffered under a disability (such as conflict of interest) that subtly pervaded his entire conduct of the defense. Rather, Stanley asserts that counsel's actual performance was inadequate, that specific actions or omissions of his attorney rendered his representation ineffective.

■ Stanley's burden, therefore, is to show that his counsel was not rendering reasonably effective assistance given the totality of the circumstances. *Washington v. Strickland,* 693 F.2d at 1250–51; *United States v. Killian,* 639 F.2d 206, 210 (5th Cir.), *cert. denied,* 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981); *Mays v. Balkcom,* 631 F.2d 48, 52 n. 1 (5th Cir.1980). Reference to the totality of circumstances implies that we look at counsel's overall performance rather than dissect his advocacy and second guess each individual action or inaction. The latter exercise would accomplish little, since a defendant is not guaranteed errorless counsel. "Our repeated assertions that a criminal defendant is not entitled to error-free counsel are not mere rhetoric." *Washington v. Watkins,* 655 F.2d 1346, 1367 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982). The court in *Washington v. Strickland* acknowledged, however, that counsel's failure effectively to pursue an entire line of defense may in some circumstances transcend the individual error category and stamp his overall performance with the mark of ineffectiveness.

■ To paraphrase Stanley's contention on appeal, the sentencing stage in a capital case is, in effect, a "trial," and counsel's failure to put forth a character evidence "defense" constituted ineffective representation. The core of Stanley's position is that the unique status of mitigation testimony in capital cases makes a failure to investigate or present such testimony when available a fundamental error rendering the overall performance ineffective. This is not because our standards of review of ineffectiveness claims are unusually strict in cases imposing the death penalty. Although the jurisprudence of this circuit has consistently recognized that "death is different" for a variety of reasons and in a number of contexts,[5] we have also applied the same legal principles governing ineffectiveness of counsel to capital and non-capital cases alike. But although the legal standards of effective representation may remain constant, "the seriousness of the charges against the defendant is a factor that must be considered in assessing counsel's per-

---

5. For an analysis of the jurisprudential reasons why "death is different," *see* Gillers, *supra* note 3, at 46–56. *See also* C. Black, Capital Punishment: The Inevitability of Caprice and Mistake 30–36 (1974).

formance." *Proffitt v. Wainwright,* 685 F.2d 1227, 1247 (11th Cir.1982) (quoting *Washington v. Watkins,* 655 F.2d at 1357). *Accord Washington v. Strickland,* 693 F.2d at 1250 n. 12.

 The sentencing stage of any case, regardless of the potential punishment, is "the time at which for many defendants the most important services of the entire proceeding can be performed." ABA Standards on the Administration of Criminal Justice, Sentencing Alternatives and Procedures § 5.3(e). The special importance of the capital sentencing proceeding gives rise to a duty on the part of defense counsel to be prepared for that crucial phase of the trial. The former fifth circuit has insisted that "effective counsel conduct a reasonable amount of pretrial investigation." *Wash-*

*ington v. Strickland,* 693 F.2d at 1251; *Goodwin v. Balkcom,* 684 F.2d 794, 805 (11th Cir.1982) ("at the heart of effective representation is the independent duty to investigate and prepare"). While most of our ineffective assistance cases deal with material witnesses rather than character witnesses, *see, e.g., Goodwin v. Balkcom,* 684 F.2d at 810–14 (ineffectiveness found where attorney in capital case failed to interview damaging prosecution witnesses in addition to presenting no evidence at the sentencing phase); *Washington v. Watkins,* 655 F.2d at 1357–64, the doctrinal underpinnings of those cases apply equally to the sentencing phase of capital trials. This circuit has not before resolved the precise issue presented by Stanley.[6] In-

**6.** The panel opinion in *Washington v. Strickland,* 673 F.2d at 894, vacated when the en banc court voted to rehear the case, employed an analysis similar to that we reach today. By contrast, Judge Clark has argued that failure to present *any* available testimony at the sentencing hearing may constitute ineffectiveness. *See Proffitt v. Wainwright,* 685 F.2d 1227, 1270–72 (11th Cir. 1982) (Clark, J., concurring and dissenting). Most of our cases have not reached the issue.

*Proffitt v. Wainwright* did not reach the precise issue presented by the present case. There are similarities, however: trial counsel in both presented no testimony at the sentencing stage, and both cases were decided prior to *Lockett* (*Lockett* was decided in 1978; Proffitt's trial was in 1974; Stanley's was in 1977, before *Lockett* but after the 1976 cases that were clear precursers of *Lockett.* *See* n. 2, *supra*), when "the law concerning capital sentencing was in a state of reformation." *Proffitt,* 685 F.2d at 1248. The court noted that the only Florida Supreme Court decision to have spoken on the issue in 1974 suggested that introduction of mitigating evidence was limited to the statutory mitigating circumstances. Thus, the court concluded that trial counsel's "belief that he could not, under the Florida statute, introduce evidence of mitigating factors not listed in [the statute] was entirely reasonable." *Id.* By contrast, the Georgia statute in effect at the time of Stanley's trial specifically allowed the sentencer to give independent weight to any mitigating circumstance, even if not specifically listed in the statute. *See* Ga.Code Ann. § 17–10–30(b) (previously codified at § 27–2534.1(b) of the 1933 Code); *Gregg v. Georgia,* 428 U.S. 153, 163–64, 96 S.Ct. 2909, 2920–21, 49 L.Ed.2d 859 (1976). In fact, the jury possesses "an unlimited power to recommend mercy with or

without reason." *Brawner v. State,* 221 Ga. 680, 685, 146 S.E.2d 737, 741, *cert. denied,* 385 U.S. 936, 87 S.Ct. 298, 17 L.Ed.2d 216 (1966); *see Collier v. State,* 244 Ga. 553, 261 S.E.2d 364, 376 (1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1346, 63 L.Ed.2d 781 (1980); *Spivey v. State,* 241 Ga. 477, 246 S.E.2d 288, 291, *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 699 (1978); Ga.Code Ann. §§ 17–9–3 & 17–10–2; *see also Gregg,* 428 U.S. at 197, 96 S.Ct. at 2936 (jury is not required to find any mitigating circumstance in order to make a recommendation of mercy that is binding on the trial court).

Similarly, the court in *Spivey v. Zant,* 661 F.2d 464, 477 (5th Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982), did not reach an argument on appeal that counsel was ineffective because he offered no mitigating evidence at the penalty phase. Further, petitioner in *Washington v. Watkins,* 655 F.2d at 1357, asserted that counsel was ineffective in making no independent investigation into his character. The court concluded that Washington's counsel was not ineffective at the guilt phase, but the court concluded that resolution of other issues in the case rendered resolution of the sentencing issue unnecessary. *Id.* at 1366.

Petitioner in *Young v. Zant,* 677 F.2d 792 (11th Cir.1982), contended that his counsel was ineffective in refusing to offer evidence of his favorable background. The court found that the "favorable background might have prompted the jury to recommend mercy," *id.* at 797, but this was only a small part of an incompetency that pervaded virtually every aspect of the defense. Judge Fay concluded that Young had not been accorded "even a modicum of professional assistance at any time." *Id.* at 795. Similarly, counsel in *Kemp v. Leggett,* 635 F.2d 453 (5th Cir.1981), failed to call sever-

effective assistance cases in general, and cases turning on the need for character witnesses in particular, are extremely fact-specific. *See Goodwin v. Balkcom,* 684 F.2d at 805 ("[e]very case involving a constitutional claim of ineffective assistance of counsel turns on the facts and the conduct of those involved"). Prior cases, while providing some guidance, are thus of limited value. Still, it is notable that no panel of the eleventh or fifth circuits has to date found ineffective counsel predicated on failure to call character witnesses at the penalty stage of a capital case. In fact, the cases strongly suggest that such an ineffectiveness claim would be difficult to sustain even apart from the additional requisite showing of prejudice.

The en banc court in *Washington v. Strickland* rejected the contention that counsel in a capital case has an absolute duty to investigate mitigating evidence even if counsel's trial strategy would not call for the use of the evidence. *Washington v. Strickland* involved a claim that trial counsel was ineffective because he did not investigate or present character witnesses or evidence of Washington's mental distress. Trial counsel had based his plea for mercy at sentencing on defendant's remorse and willingness to accept responsibility for his crime; his strategy was to introduce limited evidence of mental disturbance. Following a death sentence, Washington moved for postconviction relief on the basis of his counsel's failure to explore evidence in mitigation. Washington proffered fourteen affidavits from friends and relatives who stated they would have testified on Washington's behalf had they been requested to do so. Further, two psychia-

trists were willing to submit reports stating that Washington was "chronically frustrated and depressed." Washington called his trial counsel as a witness in the federal habeas evidentiary hearing, and the en banc court focused on counsel's explanation of his trial strategy:

> The role of strategy in the calculus of reasonableness is of particular importance to this case. [Counsel] testified that he made a strategic choice to introduce limited character evidence during the plea colloquy and thereafter to rely upon expressions of frankness, sincerity, and remorse to persuade the judge to impose a sentence of life imprisonment. In light of that strategy, [counsel] would have viewed as unnecessary an extensive investigation into Washington's character. The district court did not evaluate the credibility of [counsel's] testimony or the reasonableness of his strategy in light of available alternatives. Rather, the court concluded that [counsel] was obliged to conduct an extensive investigation of Washington's character irrespective of whether his trial strategy would benefit from such investigation . . . .

*Washington v. Strickland,* 693 F.2d at 1251.

The en banc court declined to impose a constitutional requirement that counsel perform a substantial investigation into every plausible line of defense.[7] The choice by counsel to rely upon certain lines of defense to the exclusion of others before investigating all such lines is still a strategic choice, although that choice would not receive the degree of judicial deference accorded to strategic choices made following a full investigation:

al character witnesses who were in court at petitioner's request. As in *Young,* however, that was only the tip of the iceberg. Counsel, whose previous criminal trial experience had consisted of assisting in one minor case, failed to interview the sole eyewitness to the crime or to discuss possible defenses with his client. The attorney admitted in an affidavit that he was not competent to handle a murder case. 635 F.2d at 454.

7. If given an unrestricted budget and freed of any constraints as to probable materiality or accountability, a lawyer might have cheerful-

> ly logged in many hours looking for the legal equivalent of a needle in a haystack. As already noted, a millionaire might have retained counsel to leave not a single stone unturned. However, a defendant is not entitled to perfection but to basic fairness. In the real world, expenditure of time and effort is dependent on a reasonable indication of materiality.

*United States v. Decoster,* 624 F.2d 196, 211 (D.C.Cir.1976) (footnote omitted). *See Washington v. Watkins,* 655 F.2d at 1356.

A strategy chosen without the benefit of a reasonably substantial investigation into all plausible lines of defense is generally based upon counsel's professional assumptions regarding the prospects for success offered by the various lines. The cases generally conform to a workable and sensible rule: when counsel's assumptions are reasonable given the totality of the circumstances and when counsel's strategy represents a reasonable choice based upon those assumptions, counsel need not investigate lines of defense that he has chosen not to employ at trial.

*Id.* at 1255 (footnote omitted).

In sum, an attorney who makes a strategic choice to channel his investigation into fewer than all plausible lines of defense is effective so long as the assumptions upon which he bases his strategy are reasonable and his choices on the basis of those assumptions are reasonable.

*Id.* at 1256 (footnote omitted).

■ The scope of counsel's duty to investigate character evidence in capital cases cannot be separated from the rule, articulated above, that counsel is not required under *Woodson, Lockett* and *Eddings* to present to the jury any arguably mitigating character evidence that might exist. In many cases, counsel could reasonably conclude that such evidence would be of little persuasive value or that it would cause more harm than good by opening the door for harmful cross-examination or rebuttal evidence. *See, e.g., Easter v. Estelle,* 609 F.2d 756, 759 (5th Cir.1980) ("[w]hile counsel failed to interview and subpoena certain witnesses, this constituted trial strategy since to do so would have opened the door to introduction of Easter's prior conviction"). Having conducted a sufficient investigation, counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation.

This analysis finds support in the only two fifth circuit cases that have discussed the issue of counsel's duty to investigate or present character evidence in capital cases. In *Williams v. Maggio,* 679 F.2d 381 (5th Cir.1982) (en banc), petitioner contended that his trial counsel was ineffective for failing to conduct an adequate investigation arguing that, with proper pretrial investigation, counsel would have discovered many good character witnesses:

and then would possibly have decided not to have petitioner's mother testify but would have depended on favorable testimony from members of the community. This challenge to counsel's performance attempts to do precisely that which is barred by this Court; it invites us to question counsel's trial strategy and judge his performance incompetent if it was not errorless. We decline to take this action. There is little doubt that had trial counsel employed the trial strategy proposed by petitioner, this Court would now face an effectiveness of counsel argument based thereon. Trial counsel in this case made the best of a bad case.

*Id.* at 393. Petitioner also contended that his counsel had not prepared properly for the sentencing hearing since he failed to interview six readily available character witnesses in mitigation. Affidavits from those witnesses concluded that "drugs or bad influences" had brought about the criminal conduct. Three of these witnesses testified at the guilt-innocence stage about Williams' drug use. The en banc court, including the dissenters, agreed that the affidavits revealed that the witnesses would not have added any new evidence to that which had already been presented at the sentencing hearing by petitioner's mother. *Id.* at 392, 409. The court concluded that what "petitioner's present counsel is really objecting to is the trial strategy employed by trial counsel. We do not elect to second guess the trial strategy decisions of competent counsel." *Id.* at 392.

Similarly, in *Gray v. Lucas,* 677 F.2d 1086 (5th Cir.1982), Gray asserted that his trial counsel failed to render effective assistance by not fully investigating the use of character witnesses. Gray contended on appeal that a more substantial investigation would have revealed certain witnesses who could have testified that he had a satisfactory

prison record and others who would have testified that he had become "very spiritual and exhibited a 'caring, sharing type of interest in other people.'" *Id.* at 1092. The court found, however, that even though "Gray steadfastly maintained that he did not want character witnesses, [counsel] explored the possibility of having family members testify. This proved unsuccessful, however, since Gray's mother believed that her son should be executed and his brother was unable to come to Mississippi for the trial." *Id.* at 1091. Counsel also spoke with Gray's parole officer and with a police officer who had befriended Gray. The court stated:

> Gray purports not to challenge [counsel's] choice of trial strategy. However, some of his arguments are in fact directed solely at their decision to rely on a mentally disturbed defense rather than testimony on Gray's good character.... In the case at bar, [counsel] could have reasonably decided that testimony on Gray's good character would not be persuasive to a jury aware of the nature of his crime. Moreover, their decision that good character testimony would be inconsistent with a mentally disturbed defense is perfectly reasonable. Although these two types of testimony need not be inconsistent, [counsel] could have reasonably determined that in this case a local jury would perceive them to be inconsistent. In short, counsel's tactical decision did not constitute ineffective assistance.

*Id.* at 1094.

The attorneys in both *Williams* and *Gray* had conducted constitutionally sufficient investigations into the possibility of mitigation. The courts in both cases were thus understandably reluctant to second-guess the attorneys' tactical decisions. This is no more than a specific application of the general principle that when an attorney makes an informed choice between alternatives, his tactical judgment will almost never be overturned on habeas corpus.

 On the other hand, a showing that counsel's decision to forego evidence was *not* based on a reasoned tactical judg-

ment will give rise to an ineffective assistance claim. This is as true of character evidence as it is of any other sort of evidence. Were trial counsel for a capital defendant to testify that he had no strategy whatever for the sentencing phase and that he failed to consider or develop possible mitigating evidence, then such counsel must be deemed ineffective. *See Washington v. Strickland,* 693 F.2d at 1257 (the presumption of attorney competence could be rebutted "when trial counsel testifies credibly at an evidentiary hearing that his choice was not strategic"); *Kemp v. Leggett,* 635 F.2d 453, 454 (5th Cir.1981) (ineffectiveness found when trial counsel submitted affidavit admitting he was not competent to try a murder case). Similarly, such a claim can be made out, even if trial counsel does not testify, where the circumstances clearly show that counsel's failure to offer mitigating evidence could not have been based on reasonable strategy.

 The record in the present case suggests that Stanley's counsel did in fact contemplate the possibility of a character witness defense at the sentencing stage and that he explored that possibility. While we do not know the extent of this inquiry, the transcript of the state habeas hearing confirmed that the attorney discussed the matter at least with Stanley and with Stanley's mother. We need not determine, however, whether such an investigation satisfies the stringent requirements of *Washington v. Strickland.* Even if we assume that counsel failed to conduct the requisite investigation into mitigating evidence, Stanley's claim of constitutionally ineffective assistance must ultimately fail. We noted in *Washington v. Strickland* that "an attorney who makes a strategic choice to channel his investigation into fewer than all possible lines of defense is effective so long as the assumptions upon which he bases his strategy are reasonable and his choices on the basis of those assumptions are reasonable." 693 F.2d at 1256. An attorney may proceed absent a reasonable investigation into all potential lines of defense, but he does so at his peril. In Stanley's case, an investigation into

character evidence would have revealed nothing more than general affirmations from family members and friends that Stanley had been, at a time remote from the events giving rise to the charge, a basically good and responsible child and young adult.

In his state habeas proceeding, Stanley produced the testimony of five members of his family and a family friend to the effect that if called they would have testified that he had never been in trouble, was obedient, helpful and cooperative and was not violent. His mother stated that he had difficulty in school and indicated that he was a slow learner. All of the witnesses would have been available to testify at Stanley's trial.

The pieces of evidence adduced from the witnesses at the state habeas hearing fall into one of two categories. First, there was some evidence that Stanley had a learning disability. Stanley's mother testified that her son was a slow learner and that he had been placed in an educably mentally retarded class in school. Such testimony would, however, merely repeat and corroborate material already produced. This evidence had been placed before the jury, in some detail, by various witnesses during the first phase of the trial.

Stanley's low intellectual capacity and reading ability were brought out during the testimony of E.W. Phillips, sheriff of Decatur County. Phillips read into the record the results of a psychological evaluation conducted on Stanley when he was fourteen years old. That evaluation had concluded that (1) Stanley had an IQ of 62 (counsel had previously informed the jury that "imbecile" was defined as a person with an IQ 0–65); (2) Stanley's test scores "suggest[ed] a history of culture deprivation .... The test results and observation indicated Ivon was an educatable mentally retarded youngster"; (3) it was "therefore recommended that he be placed in the exceptional child class designed for educatably mentally retarded youngsters as soon as possible to avoid any further continuation of the failure experience that he has undoubtedly incurred throughout his school history."

Similarly, Dr. Carl Smith, psychologist at the Georgia Central State Hospital, testified for the state as to Stanley's mentality, psychiatric makeup and other facets of his examination of Stanley. Smith testified that his examination revealed that Stanley had an IQ of 81 which he defined as not "too significant" in deciding whether "this particular man is mentally retarded." He did concede during an extensive and sophisticated cross-examination by Stanley's trial attorney that Stanley's IQ placed him in "the upper range of borderline mental retardation." Thus, it is evident that Stanley's mother would have added little by testifying that her son had been placed in a special class at school.

The second type of evidence presented at the state habeas hearing was testimony of Stanley's human qualities and his personal history. It is this sort of humanizing character evidence that Stanley contends is necessary for the constitutional imposition of death under the individualized sentencing requirements of *Woodson, Lockett* and *Eddings*.

Six character witnesses testified at the state hearing. Almost without exception these witnesses' testimony consisted of simple "yes" or "no" responses to counsels' questions concerning Stanley's character.[8]

---

**8.** An example is this excerpt from the testimony of Stanley's mother:

Q Did he ever get into any kind of trouble?
A No. This is the first time.
Q Was he obedient?
A Yes.
Q Had he ever been arrested?
A No.
Q Had he ever been in any trouble with the police?
A No.

Q Was he ever a problem in school?
A No.
Q Was he helpful around the house?
A Yes.
Q Did you ever see him engage in any fights or any kind of violence?
A No, sir.
Q Did he ever steal as a child?
A No.
Q Did he ever hurt anyone as a child?
A No.

Stanley's mother, Mrs. Evelyn Stanley, testified that Stanley had never been in any kind of trouble before or been arrested before. His mother told the court that she, her other son and an assistant pastor from Stanley's church were present at the trial and prepared to testify; the assistant pastor had come for that purpose. She further testified that Stanley's counsel had discussed the matter of character witnesses with her, but that the issue had been dropped.

Two of Stanley's second cousins testified. Mrs. Linda Thompson, a high school teacher in Atlanta, observed that she had known him all his life, although she only saw him twice or three times a year. She testified that Stanley was a "very likeable person. Jovial. Obedient. Willing to cooperate with the family." He was "a very altruistic person. He wasn't self centered. He loved his family and cared about them quite a bit . . . ." She also stated that Stanley had never before been in trouble with the law. Another second cousin testified that Stanley was fun loving, very obedient, very nice, had never been in trouble, and had a promising life ahead of him.

Stanley's grandmother testified that she saw her grandson almost every weekend while he was growing up. She informed the judge that Stanley had been a loving son and grandson and that he had never been in trouble before. She noted that

although she had met Stanley's lawyer prior to trial, he had never asked her about the kind of a person Ivon was. Finally, she testified that she had been unable to come to the trial because of employment pressures.

Stanley's younger brother testified that he knew his brother to be pacific, helpful and cooperative. He also stated that he had been present at his brother's trial, had met Stanley's attorney, that the lawyer never said anything to him about testifying for his brother, either before or after the jury came in with a finding of guilt.

A friend of the family testified that she had known Stanley for nine years and saw him frequently. He often played with her sons, who were his age, and he was nonviolent.

Stanley himself testified at the habeas hearing on his own behalf. He stated that his lawyer had once asked him about people who could testify about his character, that he had given the lawyer names of some people, but it never came up again. Stanley also introduced into evidence a letter from the pastor of his church which noted his good character, as well as a high school report which indicated that his character was thought to be excellent in every respect. Finally, he produced the letter that his mother had read into evidence during the penalty phase of the trial.[9]

Q Did Ivon go to church?
A Yes.

**9.** At trial, Stanley's mother's testimony was limited to reading the letter from her son into evidence:

THE WITNESS:

It says, "Dear Mother, I just sending a letter to let you know I am going to hope," I think it is—I don't know whether it is—it is R–O–O–K, room, that is room, July 6, 1976. "Hay Mother, I having"—let me see. "Hay Momma, I have seen the lawyer, mother, and he say this carries the chair and, mother, I don't know—don't know, what to go to— what now, I don't know what to do now about it, Momma, I didn't murder no one and rob no one and kidnap no one. To mother, and mother, I not lying to you. God knows it, but no one believes me, Momma. I don't know what to do. I don't know, I want—

want to go to no chair for nothing I didn't do. Tell me what to do, say, hay Momma, are you coming to see me when I go, Momma, hay, Momma, you have told me, told us to be good and you will, we won't have to go to jail. I been good," I think way, he got this W. A. Y., it say, "Momma." It is the same thing he got down there, W. A. Y.

No, it says, "Momma, don't worry. I sorry, Momma, I didn't do it, believe me, and Mary, and Cat, you good to Momma and Senator, too, be a sweet baby for me, Cat, Sheriff, pray for me, I didn't do it because no one believes me, Momma."

"I want to come home and, Momma, he told them I robbed him and I—won't make them believe it. I didn't do it. Tell me what to do."

"Hay, tell T.C. to come and see I go to Court and tell him I say hay and come, too."

We cannot say that this evidence would have had no impact on the jury, nor can we say that a tactical decision to use such evidence would have been unreasonable. It may be that often the best strategy in a capital case is to attempt to humanize the defendant by presenting evidence of his personal qualities. We are unable to hold, however, that any other strategy would be so unreasonable as to constitute ineffective assistance of counsel.

In the present case, counsel's failure to present character evidence at the mitigation phase did not deprive Stanley of his right to reasonable representation. Further, the record is silent as to counsel's perception of the strategic posture of the case. Neither party saw fit to call Stanley's trial counsel as a witness at the state habeas hearing. We thus do not know what his trial strategy was; we do not know why he elected not to pursue the character witness line of inquiry, which he initiated in conferences with both Stanley and his mother well in advance of the trial. The absence of any evidence of counsel's strategy places this case in stark contrast to cases such as *Washington v. Strickland.* We decline to infer from such silence an absence of strategy. When we know nothing of counsel's strategy, when the evidence not presented consists of general statements by family members that the defendant was, at a point in time remote from the events in question, a "good boy" and when such evidence is cumulative of evidence presented during the guilt phase of the trial, then the "ineffectiveness" prong of *Washington v. Strickland* has not been satisfied.

This is not to suggest that trial counsel's testimony about his strategy is a necessary condition of an ineffective assistance claim. If counsel's conduct is so egregious as to raise an inference that it could not reasonably be part of any legitimate strategy, *see, e.g., Nero v. Blackburn,* 597 F.2d 991 (5th Cir.1979), then counsel's testimony would not be necessary. But Stanley's is not a case in which it is difficult to visualize a plausible trial strategy to explain the actions of his attorney. Under Georgia law, the sentencing jury may consider evidence placed before it during both phases of the trial. *See* Ga.Code Ann. § 17–10–30(b) (formerly codified at § 27–2534.1(b) of the 1933 Code). Thus, while Stanley's trial counsel elected not to offer additional evidence during the sentencing phase, we agree with the state habeas court that "it is incorrect to say that counsel offered no mitigating evidence" at all. The record belies the assertion that trial counsel made no effort to place before the jury information that might have tended to mitigate the jury's view of what his punishment should be.

The character testimony of the state habeas witnesses was problematical,[10] and the state habeas court was correct in finding that the "testimony of these witnesses, mostly relatives, related to fairly obvious assertions of familial-type affection and loyalty which may well have no effect, or no good effect, on the jury." While character witnesses may make a critical difference, especially in a capital case, their utility in any given case is very much a matter of judgment and trial tactics.

Further, mitigation may be in the eye of the beholder.[11] Stanley's mother testified

---

**10.** It was also arguably redundant. Stanley testified during the guilt phase of the trial, giving his age, some of his background, employment and information about his family. Further, Stanley's mother read into evidence the letter from her son quoted in note 9, *supra.*

**11.** *See, e.g., Washington v. Watkins,* 655 F.2d 1346 (5th Cir.1981). The panel majority found that Washington's steady domestic relationship and his role as a father might have been deemed mitigating factors. *Id.* at 1375–76.

Judge Coleman disagreed contending that "there was no mitigation in what the majority chooses to assert 'might have been' mitigating." *Id.* at 1379 (Coleman, J., dissenting) (capitalization altered). Judge Coleman went on to explain:

Neither society nor Mississippi law has ever favored the procreation of illegitimate children by self-indulgent fathers.

All this being so, I simply cannot understand how the majority holds that violating

at the state habeas hearing, for example, that her son went to church. This evidence might be deemed mitigating, but it also could well have been perceived by the jury as being aggravating: if Stanley went to church, then he should have known the extreme culpability of his conduct. It is questionable, therefore, whether the evidence asserted by Stanley to be "mitigating" would have been perceived by the jury as such.

None of this is very precise, but that, in fact, is the point of our reluctance to second guess trial counsel's strategy. Effective counsel in a given case may consider the introduction of character evidence to be contrary to his client's interest. In other cases he may consider it unlikely to make much difference. In certain cases he may conclude that although available testimony might be minimally helpful, it would detract from the impact of another approach that he considers more promising. His position in reaching these conclusions is strikingly more advantageous than that of a federal habeas court in speculating post hoc about his conclusions. His knowledge of local attitudes, his evaluation of the personality of the defendant and his judgment of the compatibility of the available testimony and the jury's impression of defendant, his familiarity with the reactions of the trial judge under various circumstances, his evaluation of the particular jury, his sense of the "chemistry" of the courtroom are just a few of the elusive, intangible factors that are not apparent to a reviewing court, but are considered by most effective counsel in making a variety of trial and pretrial decisions.

Representation of a capital defendant calls for a variety of skills. Some involve technical proficiency connected with the science of law. Other demands relate to the art of advocacy. The proper exercise of judgment with respect to the tactical and strategic choices that must be made in the conduct of a defense cannot be neatly plotted in advance by appellate courts.[12]

There may well have been sound considerations which dictated that counsel pursue the path that he elected. He may have felt that he had placed before the jury enough of the usable mitigation information and that a parade of family and friends—testimony available to most capital defendants—would do no good, and, indeed would detract from the force of the argument which he intended to make. Whatever his reason, or lack thereof, it was not presented to the habeas court. In such situations "[c]ourts presume, in accordance with the general presumption of attorney competence, that counsel's actions are strategic." *Washington v. Strickland,* 693 F.2d at 1257. In the absence of any evidence to overcome the presumption, no constitutional error is shown.

### (2)

Stanley asserts that the aggravating circumstance set out in Ga.Code Ann. § 17–10–30(b)(7), upon which his death sentence was at least partially based, was applied in an impermissibly vague, overbroad and ambiguous manner in violation of rights protected by the eighth and fourteenth amendments. Specifically, he challenges the trial court's instruction on section (b)(7).[13] Stan-

---

the law by living together in an illegal relationship and fathering an illegitimate daughter "might be" a mitigating factor in a coldly planned robbery wherein the defendant chose to shoot the victim's entrails out and then coolly reloaded his shotgun as if he had done no more than kill a rabbit.
*Id.*

12. The third circuit put it this way:
The artistry of the advocate is difficult to judge retrospectively because the elements influencing judgment usually cannot be captured on the record. The kaleidoscopic range of possibilities often seem limitless, and it is proverbial that the finest ideas emerge on the

way back from the courthouse. The advocate's work, therefore, is not readily capable of later audit like a bookkeeper's.
*Moore v. United States,* 432 F.2d 730, 736–37 (3d Cir.1970) (en banc).

13. Stanley did not object at trial and therefore under Georgia law he waived any claim of error. *Jones v. State,* 249 Ga. 605, 293 S.E.2d 708, 714 (1982); *Cunningham v. State,* 248 Ga. 558, 284 S.E.2d 390, 396 (1981), *cert. denied,* 455 U.S. 1038, 102 S.Ct. 1741, 72 L.Ed.2d 155 (1982); *Gilreath v. State,* 247 Ga. 814, 279 S.E.2d 650, 670 (1981). We address the issue solely because the state habeas court ruled on its merits.

ley contends that *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) requires the trial court to instruct the jury of the limiting construction which the Georgia Supreme Court has placed on section (b)(7).

We do not read *Godfrey* as holding that a limiting instruction is required. The inquiry in *Godfrey* focused on whether the evidence in that case satisfied the criteria previously established by the Georgia Supreme Court for application of section (b)(7). By stressing the factual setting that gave rise to the case, the Supreme Court in *Godfrey* was not required to resolve the issue of whether a limiting instruction of section (b)(7) is mandated by cases such as *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) that stress the importance of channeling jury discretion in death cases, or whether the Georgia Supreme Court's proportionality review of capital cases is alone sufficient to keep section (b)(7) within constitutional bounds.

If we assume without deciding that such an instruction is required, the record before us falls far short of supporting the grant of the writ. Justice Stewart's plurality opinion in *Godfrey* found the first phrase of section (b)(7) to lack restraining effect on the arbitrary and capricious infliction of the death penalty: "A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.'" 446 U.S. at 428–29, 100 S.Ct. at 1764–65. He analyzed Georgia law, derived from two opinions of the Georgia Supreme Court,[14] as follows:

> The *Harris* and *Blake* opinions suggest that the Georgia Supreme Court had by 1977 reached three separate but consistent conclusions respecting the § (b)(7) aggravating circumstance. The first was that the evidence that the offense was "outrageously or wantonly vile, horrible or inhuman" had to demonstrate "torture, depravity of mind, or an aggravated battery to the victim." The second was

that the phrase, "depravity of mind," comprehended only the kind of mental state that led the murderer to torture or to commit an aggravated battery before killing his victim. The third, derived from *Blake* alone, was that the word, "torture," must be construed *in pari materia* with "aggravated battery" so as to require evidence of serious physical abuse of the victim before death.

*Id.* at 431, 100 S.Ct. at 1766 (footnotes omitted). Using this standard he concluded that the Georgia Supreme Court had misapplied its own constitutional construction because the evidence that it found sufficient did not reveal a consciousness materially more depraved than that of any other murderer. His reference to the fact that Godfrey's victims were killed instantaneously noted the absence of any evidence of serious physical abuse before death.

The trial court's charge to the jury in *Godfrey* was stated in the disjunctive language of the statute, *i.e.,* that the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind *or* an aggravated battery to the victim." (emphasis added). Use of the disjunctive authorized the jury to find depravity of mind even absent any serious physical abuse of the victim before death. The jury did not address the second phrase in its finding at all. It found merely that the offense was outrageously or wantonly vile, horrible and inhuman. 446 U.S. at 426, 100 S.Ct. at 1763. Concerning this part of the judge's instructions and the jury's response, Justice Stewart said in dicta, "These gave the jury no guidance concerning the meaning of § (b)(7)'s terms. In fact, the jury's interpretation of § (b)(7) can only be the subject of sheer speculation." *Id.* at 429, 100 S.Ct. at 1765.

The instruction given Stanley's jury was significantly different. Section (b)(7) was stated in terms of the state's contention: that the offenses were "outrageously and wantonly vile, horrible and inhuman, in

---

14. *Blake v. State,* 239 Ga. 292, 236 S.E.2d 637, *cert. denied,* 434 U.S. 960, 98 S.Ct. 492, 54 L.Ed.2d 320 (1977); *Harris v. State,* 237 Ga. 718, 230 S.E.2d 1 (1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 251 (1977).

that the offenses involved Defendant's depravity of mind *and* torture to the victim." (emphasis added). The jury reported a finding beyond a reasonable doubt in the same language: "the offense involved depravity of mind *and* torture to the victim" (emphasis added).

The vice to which Justice Stewart pointed is simply absent. Under their instructions Stanley's jury could not fix punishment at death unless they found beyond a reasonable doubt that his depravity of mind resulted in torture to his victim. *Godfrey*'s jury was free to fix punishment at death even in the absence of any abuse of his victim before death and, indeed, they did so.

Arguably the undefined word "torture" still falls short of meeting the test because in a given case a jury might understand it to mean mental torture rather than a word to be read *in pari materia* with "aggravated battery" to require evidence of serious physical abuse. Stanley, however, is in no position to contend for a limitation of the word "torture" in his case. No contention is made that the torture to which his victim was subjected was anything other than physical. The evidence disclosed that in fact it was the most extreme type of physical abuse aptly characterized by the Supreme Court of Georgia: "Although the sheer savagery of Ivon Stanley's conduct may have been equalled by others, it has seldom if ever been exceeded." *Stanley v. State*, 241 S.E.2d at 180.

 Our habeas corpus review focuses on the role of the great writ as "a bulwark against convictions that violate 'fundamental fairness.'" *Engle v. Isaac*, 456 U.S. 107, 126, 102 S.Ct. 1558, 1570, 71 L.Ed.2d 783 (1982). As a threshold for our intrusion into state criminal trials we look to see that petitioner has shown "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982) (emphasis in original). Stanley's claim of deficiencies in the section (b)(7) instruction provides insufficient justi-

fication for habeas relief in light of the evidence before us.

(3)

Stanley was arrested two days after the murder. He was advised of his rights and signed a waiver of counsel form. He was interviewed by an agent of the Georgia Bureau of Investigation but at that time denied any involvement.

Three days later Stanley was again interviewed. He had not then consulted a lawyer. He was again read his *Miranda* rights, allowed to read the rights from the form, acknowledged that he understood his rights and then signed the form. Stanley then gave a tape recorded statement in which he confessed to the details of the robbery and murder.

 Stanley argues that use of a "waiver of counsel" form does not satisfy the *Miranda* requirement that prisoners be meaningfully advised that they had a right to counsel—not just a right to waive counsel. The contents of the form and the tape recorded interview, however, make it absolutely clear that Stanley was advised fully and correctly of his rights and that he acknowledged that he understood separately with respect to each provision. Stanley's criticism of the caption of the form finds no support in either *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the authorities on which he purports to rely. The record strongly supports the district court's conclusion that Stanley "was thoroughly advised of his right to consult with an attorney before making any statement and that he understood his rights and was willing to make a statement freely and voluntarily." *Stanley v. Zant*, Civ. Action No. 80–66–THOM, slip op. at 3 (M.D.Ga. June 11, 1981).

(4)

 Stanley's final contention is grounded on his own testimony that he took no part in the killing and tried to discour-

age codefendant Thomas from killing the victim. Based on this version of the murder, he argues that imposition of the death penalty is unconstitutional because he possessed no purpose to cause the death of the victim.

Subsequent to oral argument the Supreme Court spoke to this subject area in *Enmund v. Florida,* —— U.S. ——, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), where on eighth and fourteenth amendment grounds it reversed a death penalty that was based on a conviction for felony-murder. The Supreme Court examined the historical development of the death penalty for accomplice liability and concluded that our culture has rejected the imposition of the penalty upon persons who "neither took life, attempted to take life nor intended to take life." *Id.* at ——, 102 S.Ct. at 3371. The Supreme Court accepted the holding of the Florida Supreme Court that the record supported no more than an inference that Enmund was the driver of the getaway car, where he remained throughout the robbery and murder:

> [T]he only evidence of the degree of his participation is the jury's likely inference that he was the person in the car by the side of the road near the scene of the crimes. The jury could have concluded that he was there, a few hundred feet away, waiting to help the robbers escape with the ... money. The evidence, therefore, was sufficient to find that the appellant was a principal of the second degree, constructively present aiding and abetting the commission of the crime of robbery.

*Id.* at ——, 102 S.Ct. at 3371 (quoting . *Enmund v. State,* 399 So.2d 1362, 1370 (Fla.1981)).

Stanley's level of personal culpability is greater than Enmund's by at least an order of magnitude. It was Stanley, himself, who was overheard long before the murder to say that after he and Thomas robbed the victim they would have to "get rid of him." His role was aptly described by the Supreme Court of Georgia as follows:

> [T]here was evidence showing that he was an active participant in the crimes:

enticing the victim to the place of the robbery, handling the pistol, guarding the victim while Thomas moved the car, digging the victim's grave, and burying the victim while he was still alive and pleading for his life.

*Stanley v. State,* 241 S.E.2d at 180.

From our examination of the record we agree with the district court that "a trier of the fact could conclude beyond a reasonable doubt that the Defendant had a clear intention to kidnap, rob and murder the victim."

AFFIRMED.

FAY, Circuit Judge, concurring:

Bound by our court's recent opinion in *Washington v. Strickland,* 693 F.2d 1243 (5th Cir.1982) (Unit B en banc), I concur. My personal views continue to be those expressed in the dissents of Judges Roney and Hill.

ARNOLD, Circuit Judge, Sitting by Designation, dissenting.

In the penalty phase of his capital trial, counsel for Ivon Ray Stanley introduced no evidence. We now know that relatives and friends of the defendant could have given testimony that would have portrayed Stanley as a "uniquely individual human being [ ]," *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion), perhaps worthy of the compassion of at least one member of the jury. The Court concedes that it "cannot say that this evidence would have had no impact on the jury," *ante,* at 969 and that "[w]e ... do not know what [counsel's] trial strategy was ...," *ibid.* Yet, the death penalty is upheld because Stanley did not, at the evidentiary hearing held by the state post-conviction court, prove that counsel's conduct was *not* the result of some reasonable trial strategy. Because I cannot agree with this allocation of the burden of proof, I respectfully dissent.

As an original matter, I should not have placed the burden of proof on Stanley to negative the possibility that his lawyer had made a tactical or strategic choice to

present no evidence in mitigation. In general, the burden is and should be on anyone who seeks to overturn the judgment of a court having jurisdiction. And it is eminently fair to require a defendant who claims his lawyer was ineffective to come forward with specific complaints about what the lawyer failed to do, and with specific arguments about how this failure hurt his case. If the claim is, for example, that certain witnesses were not presented, the defendant should be required to show who they were and what they would have said if called to testify. That kind of evidence is readily accessible to the defendant, and probably to no one else, since defense witnesses in the penalty phase of a capital trial are likely to be family members, friends, or acquaintances. "Generally, the burden of proof is allocated to that party who has control of the evidence required to prove the claim raised in the action. In an action based on a claim of ineffective assistance of counsel due to a failure to produce evidence, this mitigating evidence is peculiarly within the control of the petitioner. Therefore, it is appropriate in such cases to allocate the burden of proof to the petitioner." *Washington v. Strickland,* p. 1274 n. 23 (5th Cir.1982) (Unit B en banc) (Tjoflat, J., concurring). To this extent, Stanley has met his burden, and I do not understand the Court to hold otherwise.

The question of trial counsel's strategy, or lack of it, is quite different. The lawyer himself is obviously the best witness on that subject, in many cases the only witness, but he is now in an adversary position vis-a-vis his former client. He may be unwilling to cooperate with present counsel. The very point of the proceeding is to challenge his professional conduct. He is much more likely to cooperate and consult with counsel for the State, whose object at the hearing will be to vindicate his conduct. It makes more sense, it seems to me, to put the burden of proof on the State, once a petitioner demonstrates some omission serious on its face, to call trial counsel as a witness

to explain his or her reasons for what was done at the trial. "If in a given case the petitioner does not have access to the information necessary to sustain his burden of proof, the district court is of course free to make appropriate adjustments in the allocation of the burden." *Washington v. Strickland, supra,* at 1261 n. 31. Here, the State did not call trial counsel as a witness; its brief in this Court does not suggest what counsel's strategy was; we do not know what it was; and no court, state or federal, has ever found that counsel's conduct was the result of a strategic decision. In this situation, if I were free to do so, I should hold that counsel was constitutionally ineffective and that petitioner should have a new trial. He would not be released from prison. There would simply be a new trial as to punishment, and the worst that could happen, from the point of view of the State, would be a sentence of life imprisonment.

Obviously my view of the proper allocation of the burden of proof is influenced in part by the fact that this is a death case. The more serious the consequences of a wrong decision, the more one wants to be careful to make the right one. That is what burden of proof is all about. Rules about presumptions and burdens of proof reflect one's views about where the risk of loss ought to be placed, and about what kinds of mistakes are more tolerable than others. Presumptions are not usually applied *in favorem mortis.* It is not a novel proposition that judgments inflicting the penalty of death should be hedged about with greater safeguards. The very existence of bifurcated trials in death cases proves that, if proof be needed. It may be true that the same legal principles govern ineffectiveness of counsel in capital as in non-capital cases; it is also true that the seriousness of the charges is a factor to be considered in assessing counsel's performance. *Ante,* at 962–963.[1] It is not asking too much, when life is at stake, to require the State or counsel himself to explain a choice

---

1. *Cf. Holtan v. Parratt,* 683 F.2d 1163, 1170 (8th Cir.1982) (counsel's ineffectiveness held prejudicial in a capital case in part "because of the dire consequences that would [otherwise] flow . . . .").

to present *no* evidence in mitigation. This is not a case, as I shall argue below, where counsel chose to present one line of testimony rather than another. Nor is it a case where a plausible strategic explanation readily suggests itself. "It is not enough," as the Supreme Court said in another capital case involving the right to counsel, "to *assume* that counsel ... thought there was no defense and exercised [his] best judgment." *Powell v. Alabama,* 287 U.S. 45, 58, 53 S.Ct. 55, 60, 77 L.Ed. 158 (1932) (emphasis supplied).

As I understand the en banc opinion in *Washington v. Strickland, supra,* however, it is the rule of this Circuit that if a lawyer fails to conduct a substantial investigation into one plausible line of defense, "[c]ourts presume, in accordance with the general presumption of attorney competence, that counsel's actions are strategic." *Id.* at 1257. It is, in general, up to the petitioning prisoner to rebut this presumption, by, for example, calling counsel as a witness to testify that his choice was not strategic. Sitting by designation as a judge of this Circuit, I am bound by that rule. Even so, there are at least three reasons why the presumption of strategic choice should not apply to the facts of this case.

*First.* This is not a case in which counsel discerned several plausible lines of defense and chose to make a substantial investigation of fewer than all of them. Here, counsel made no investigation whatever, so far as I can tell, of mitigating evidence. To be sure, the jury is free to consider, in mitigation, evidence already before it on the question of guilt or innocence, and counsel might choose not to repeat that evidence. But here a good deal of what could have been presented in mitigation was not repetitious at all. Counsel discussed the possibility of character witnesses with petitioner

and his mother, and Stanley gave him some names, but the subject never came up again, and counsel did not discuss possible mitigating testimony with any of the other witnesses who later testified at the state habeas hearing. The Court does not claim that this "investigation," if it can be called that, "satisfies the stringent requirements of *Washington v. Strickland*." *Ante,* at 966. It seems to say, instead, that counsel could reasonably have chosen to pursue some other strategy. The difficulty with this reasoning is that counsel did *not* pursue any other line of defense. This is not a case, for example, of counsel's choosing to call witnesses as to diminished mental capacity, instead of character witnesses. Here no witnesses at all were called. If counsel's closing argument to the jury (of which more hereafter) is to be treated as a "strategy" or a "line of defense" that counsel chose in preference to character witnesses, it is still difficult to approve his choice as constitutionally effective lawyering. The closing argument, at best, was a simple plea for mercy, and character evidence would have helped that plea, not hurt it. There is nothing in the least inconsistent about calling character witnesses and then pleading for mercy. In short, this case should be governed by the Court's statement in *Washington,* at 1252–53, that "permissible trial strategy can never include the failure to conduct a reasonably substantial investigation into a defendant's one plausible line of defense." [2]

*Second.* As the Court notes in *Thomas,* the companion case, 697 F.2d at 988 Ga.Code § 38–801(d) (recodified at § 24–10–24, 1982) requires the tender of a witness fee of ten dollars and mileage of 20 cents a mile with the service of a subpoena for the attendance of a witness. Stanley was con-

---

**2.** The only material difference between this case and *Thomas v. Zant,* 697 F.2d 977 (11th Cir.1983), also being decided today, is that in *Thomas* petitioner proffered in the District Court an affidavit of trial counsel that she did not "investigate or interview witnesses for the penalty phase of [the] trial. I made no preparation or presentation of any mitigation circumstances." *Thomas v. Zant,* at 988. Very

nearly the same thing can be said about Stanley's trial counsel. Yet, Thomas will live, for the time being at least, but Stanley, if this Court has the last word, will die. They committed the same crime. It is true in *Thomas,* as it is here, that "[t]he present record contains no direct evidence of why trial counsel was not called to testify at the state habeas proceeding." *Id.* at 988.

victed in Decatur County, in the southwestern part of the State. He is in prison in Butts County, in central Georgia. State habeas must be brought in the county of incarceration, Ga.Code § 50–127 (recodified at § 9–14–43, 1982), and that is where Stanley's two state habeas petitions were filed. Stanley has no money, and indigent habeas petitioners have no right to financial assistance under Georgia law. *State v. Davis,* 246 Ga. 200, 269 S.E.2d 461, *cert. denied,* 449 U.S. 1057, 101 S.Ct. 631, 66 L.Ed.2d 511 (1980); *Pulliam v. Balkcom,* 245 Ga. 99, 263 S.E.2d 123, *cert. denied,* 447 U.S. 927, 100 S.Ct. 3023, 65 L.Ed.2d 1121 (1980). Not even witness fees will be waived. *Neal v. Smith,* 226 Ga. 96, 98, 172 S.E.2d 684, 686 (1970) (Georgia laws do "not contemplate that the public shall bear the expense of bringing witnesses into court.").

It is unjust for the State to deny petitioner the means to subpoena his trial counsel to testify at his state habeas hearing, and for the federal courts then to fault him for not showing, through the testimony of counsel, counsel did not make a strategic choice. Surely this kind of disability, placed upon Stanley because of his poverty, should excuse his not meeting his burden of proof. He could have had witnesses subpoenaed at federal expense to testify before the federal habeas court, but the District Court declined to hold an evidentiary hearing. In *Thomas* an evidentiary hearing will be held on remand, and one of the points raised will presumably be that Thomas was not guilty of deliberately bypassing an available state procedure precisely because state law denied him the means of using that procedure. I would allow Stanley at least the same chance to establish an excuse for not meeting his burden of proof.

*Third.* The presumption that counsel's choice was a strategic one can be rebutted not only "when trial counsel testifies credibly at an evidentiary hearing that his choice was not strategic," but also "when certain of counsel's actions do not conform to a general pattern of a rational trial strategy." *Washington v. Strickland, supra,* at p. 1258. I think this record contains a substantial indication that the latter standard is met.

In the course of his final address to the jury counsel said:

> I have done my duty. I'll walk out of this courtroom today feeling that I have even gone overboard against my friends, against those I sit in church with, against those I have sat in the lodge with, against those I have broken bread with.

We do not know what counsel hoped to accomplish by these remarks. Perhaps he meant to say, "I have done my duty. Now you, the jury, should do yours by being merciful." But the natural meaning of the words is quite different. They seem to be asking the jurors to forgive the lawyer, their fellow citizen, for taking the side of a criminal. They seem to be apologizing for the vigor of the defense counsel had offered. They raise the question whether counsel's decision to present no evidence in mitigation, far from being a strategic choice, was rather motivated by a desire not to offend church and lodge by going any further "overboard" in Stanley's cause. When a lawyer has a conflict of interest between two defendants, both of whom he is trying to represent, the conviction will be reversed without a showing of prejudice. See *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). Here a conflict just as real seems to have existed in the lawyer's mind. He had "gone overboard" in the guilt-or-innocence phase of the trial, and chose to present no evidence in the punishment phase. Here, just as "in a case of joint representation of conflicting interests[,] the evil ... is in what the advocate finds himself compelled to *refrain* from doing." *Holloway v. Arkansas, supra,* 435 U.S. at 490, 98 S.Ct. at 1181.

The implications of counsel's closing argument, it seems to me, are at least serious enough to neutralize any presumption that his decision to present no mitigating evidence was a reasonable strategic choice.

---

Perhaps my reconstruction of counsel's possible motivation is unfairly harsh. If so, an evidentiary hearing on remand could set the record straight. The Court suggests

that counsel, if he had made an investigation of character witnesses, might have decided that they would do Stanley more harm than good. Certainly that is true in the abstract. But there is very little concrete indication that character witnesses would have hurt Stanley's chances in this case. Some evidence will almost always be better than none. With all deference, the Court's reflections on Stanley's lawyer's possible mental processes are no more than speculation.

At the very least I would remand this case for an evidentiary hearing on why no evidence in mitigation was offered. I therefore respectfully dissent.