**Freddie DAVIS, Petitioner-Appellee, Cross-Appellant,**

v.

**Ralph KEMP, Warden, Georgia Diagnostic and Classification Center, Respondent-Appellant, Cross-Appellee.**

No. 83–8384.

United States Court of Appeals, Eleventh Circuit.

Sept. 30, 1987.

Rehearing and Rehearing En Banc Denied Nov. 25, 1987.

---

Mary Beth Westmoreland, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellant, cross-appellee.

Joseph M. Nursey, Millard C. Farmer, Atlanta, Ga., for petitioner-appellee, cross-appellant.

Before HILL and KRAVITCH, Circuit Judges, and MORGAN, Senior Circuit Judge.

HILL, Circuit Judge:

Ralph Kemp, Warden of the Georgia Diagnostic Center, appeals to this court from an order of the district court granting Freddie Davis' petition for a writ of habeas corpus, and thus prohibiting his execution unless the state holds a resentencing hearing within 180 days. Davis has filed a cross-appeal from the order of the district court denying relief as to the other grounds set forth in his petition. We affirm the order of the district court denying relief as to the grounds raised by Davis in his cross-appeal and reverse the order granting relief on the grounds addressed by the state's appeal.

Davis was indicted in Meriwether County, Georgia, on charges of murder and rape; at his trial in March 1977, the jury found him guilty of both crimes. At his sentencing hearing, the jury found an aggravating circumstance, see O.C.G.A. § 17-10-30(b)(2),[1] and the judge sentenced Davis to death for the murder and life imprisonment for the rape. Davis appealed his convictions and sentence to the Georgia Supreme Court. In February 1978, that Court upheld Davis' convictions but vacated his death sentence. See Davis v. State, 240 Ga. 763, 243 S.E.2d 12 (1978). At Davis' second sentencing hearing in May 1978, the jury found two statutory aggravating circumstances, see O.C.G.A. § 17-

10–30(b)(2) & (b)(7),[2] and the judge sentenced Davis to death. Davis appealed to the Georgia Supreme Court, which affirmed the death sentence. See Davis v. State, 242 Ga. 901, 252 S.E.2d 443 (1979). The United States Supreme Court vacated the second death sentence and remanded the case to the Georgia Court for reconsideration in light of Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). See Davis v. Georgia, 446 U.S. 961, 100 S.Ct. 2934, 64 L.Ed.2d 819 (1980). The Georgia Court reinstated the death sentence, see Davis v. State, 246 Ga. 432, 271 S.E.2d 828 (1980), and the Supreme Court denied certiorari. See Davis v. Georgia, 451 U.S. 921, 101 S.Ct. 2000, 68 L.Ed.2d 312 (1981). Davis then filed a petition for a writ of habeas corpus in state superior court. The state court denied this petition on February 5, 1982, and the Georgia Supreme Court denied Davis' application for a certificate of probable cause on March 24, 1982. The United States Supreme Court again denied certiorari. See Davis v. Georgia, 459 U.S. 891, 103 S.Ct. 189, 74 L.Ed.2d 153 (1982).

On December 15, 1982, Davis filed a petition for a writ of habeas corpus in federal district court. The court denied this petition on December 20, 1982. Davis, with new counsel, filed various pleadings with the district court, which he characterized as amended petitions,[3] in an effort to raise new claims. Although the district court found the petitions to be successive and an abuse of the writ, on December 23, 1982, the court agreed to reconsider the case. On April 8, 1983, the court granted Davis the above-described partial relief.

This appeal was held in abeyance pending four en banc opinions affecting the outcome of this case. With the Supreme Court's denial of certiorari on March 2, 1987 in Tucker v. Kemp, 762 F.2d 1480 (11th Cir.1985) (en banc), vacated, 474 U.S.

---

1. This subsection was formerly Ga.Code Ann. § 27–2534.1(b)(2).

2. These subsections were formerly Ga.Code Ann. §§ 27.2534.1(b)(2) & (b)(7).

3. Davis argues that he timely filed a motion under Federal Rule 60(b) to reopen judgment. Because of our disposition of the issue, we do not decide whether this is an accurate characterization of the course of the proceedings.

1001, 106 S.Ct. 517, 88 L.Ed.2d 452 (1985), *on remand*, 802 F.2d 1293 (11th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987), the appeals in these four cases became final. Accordingly, we proceed to analyze the issues set forth in Davis' petition.

### I

■ Davis raised three of his claims on appeal for the first time in his second federal habeas petition.[4] The state contends that the district court improperly considered Davis' second petition after finding it to be a successive petition and an abuse of the writ. We hold that, under the controlling case law, the district judge did not abuse his discretion in considering the issues raised in the successive petition in this case.

As the Supreme Court has stated, the district courts are responsible for

the just and sound administration of the federal collateral remedies, and theirs must be the judgment as to whether a second or successive application shall be denied without consideration of the merits. Even as to such an application, the federal judge clearly has the power— and, if the ends of justice demand, the duty—to reach the merits.

*Sanders v. United States,* 373 U.S. 1, 18–19, 83 S.Ct. 1068, 1078–79, 10 L.Ed.2d 148 (1963); *see also Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 2625, 91 L.Ed.2d 364 (1986) ("the permissive language of § 2244(b) gives federal courts discretion to entertain successive petitions under some circumstances"); *Potts v. Zant,* 638 F.2d 727, 741 (5th Cir. Unit B 1981). In his order, the district judge specifically cited *Sanders* and *Potts.* We thus conclude that, despite his decision that Davis had abused the writ, the district judge relied on the proper grounds in exercising his discretion, concluding that the

"ends of justice" justified considering Davis' amended petition. *See Sanders,* 373 U.S. at 15, 83 S.Ct. at 1077.[5]

### II

The district court granted the writ because it found the closing argument of the prosecutor at Davis' sentencing hearing unconstitutional under our decision in *Hance v. Zant,* 696 F.2d 940 (11th Cir.1983). In *Hance,* the court found unconstitutional arguments made by the prosecutor which were similar to the arguments delivered in this case. The decision in *Hance,* however, has been largely overruled. *Brooks v. Kemp,* 762 F.2d 1383, 1399 (11th Cir.1985) (en banc), *vacated on other grounds,* — U.S. ——, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986); *see Drake v. Kemp,* 762 F.2d 1449 (11th Cir.1985) (en banc), *cert. denied,* — U.S. ——, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986); *Tucker v. Kemp,* 762 F.2d 1480 (11th Cir.1985) (en banc), *vacated,* 474 U.S. 1001, 106 S.Ct. 517, 88 L.Ed.2d 452 (1985), *on remand,* 802 F.2d 1293 (11th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987); *Tucker v. Kemp,* 762 F.2d 1496 (11th Cir.1985) (en banc).

Generally the court engages in a two step process in determining whether a habeas petitioner is entitled to relief based upon a prosecutor's arguments. First, we consider whether the prosecutor's arguments were improper. Second, we consider whether any arguments found improper were so prejudicial as to render the trial fundamentally unfair. As we noted in *Brooks,* 762 F.2d at 1400, "it is not our duty to ask whether a particular remark was unfair; we are concerned with whether it rendered the entire trial unfair." The Supreme Court has recently reaffirmed the standard to be employed in reviewing a prosecutor's argument:

The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the re-

---

**4.** Davis asserted for the first time that the prosecutor's closing argument was unconstitutional, that there was insufficient evidence to support his rape conviction, and that, in light of the insufficient evidence, his death sentence is invalid.

**5.** We do not hold that the judge was required to consider Davis' second petition. Indeed, we might well uphold a decision by the district court refusing to consider the second petitioner if that question were before us today.

sulting conviction a denial of due process." *Donnelly v. De Christoforo*, 416 U.S. 637 [94 S.Ct. 1868, 40 L.Ed.2d 431] (1974). Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.* at 642, 94 S.Ct. at 1871.

*Darden v. Wainwright*, 477 U.S. 187, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Applying this standard, we conclude that the prosecutor's closing arguments did not render Davis' trial fundamentally unfair.

■ Davis primarily attacks six portions of the prosecutor's arguments which he considers unconstitutional. During the sentencing phase, the prosecutor analogized the role of the jury and the role of soldiers fighting for their country:

I know it's difficult and an unpleasant thing. Nobody would like to recommend the death penalty for anybody else, but people, unfortunately, are faced with difficult times, having to do difficult things. Every one who goes into the armed services has a difficult duty. Oftentimes these men have to go into battle and fight and get killed although they might be opposed to the practice of killing. But, in order to protect our country and preserve it, keep it where it is and keep it free, they must occasionally go into battle and kill people. It's the same principal that applies here, and I submit, Freddie Davis and people like him are just as much as an enemy of this country as soldiers who have fought against this country in war. In fact, even more because these soldiers are fighting for their own country.

Freddie Davis has no such motives. His motives are self-motivations, greed, lust or what have you. Let's not feel sorry for Freddie Davis. There has been no evidence whatsoever presented by Freddie Davis to repute [sic] or dispute or rebute [sic] any evidence that we have submitted. The evidence that we have submitted must be taken as true because you have no other evidence presented to you. That's it.

In *Brooks,* we found improper an argument that was similar in some respects to the argument quoted above but was in other respects more egregious. We noted that "the analogy of the death penalty to killing in a war was appropriate insofar as it implied that imposing death, while difficult, is at times sanctioned by the state because of compelling reasons (national security or deterring crime)." 762 F.2d at 1412. We found the particular analogy drawn in *Brooks* to be improper, as it "undermine[d] the crucial discretionary element required by the Eighth Amendment." *Id.* at 1413. In that case, however, "[t]he improper aspect of the argument was the suggestion that the jurors should forego an individualized consideration of Brooks' case and instead choose execution because he was part of the broad 'criminal element' terrorizing American society." *Id.* at 1414. The excerpt quoted above included no such suggestion. Instead, the prosecutor emphasized the evidence in this particular case and the duty of the jury to impose a sentence of death if they deemed it appropriate under the particular circumstances of the crime Davis committed. The prosecutor thus avoided the argument held improper in *Brooks.*

■ Also challenged is the prosecutor's argument concerning the deterrent value of the death penalty:

We do know this, that in the last 10 or 12 years, since we haven't had but one death penalty in the whole United States, violent crimes have increase [sic] tremendously. They are running rampant in this country. You cannot pick up the newspaper, listen to the television, or radio, read a magazine or anything about the news without reading about some vile, horrible, unspeakable crime. These crimes are happening in much more frequency now than they did while we were imposing the death penalty on people who committed these crimes. That's just the facts of life. We do know that this is happening.

This argument was not improper. Arguments by the prosecutor that the death penalty serves as a deterrent are proper. *Brooks,* 762 F.2d at 1407 ("In deciding

whether to impose the death penalty in a particular case, it is appropriate for a jury to consider whether or not the general deterrence purpose of the statute is served thereby."); *Drake*, 762 F.2d at 1449; *Tucker*, 762 F.2d at 1484; *Tucker*, 762 F.2d at 1505; *Collins v. Francis*, 728 F.2d 1322, 1339 (11th Cir.1984). One of the stronger arguments relied upon by defense attorneys during the sentencing phase of a death case is that nothing would be served by taking the defendant's life. The prosecutor is permitted to rebut such an argument. The constitution does not require one-sidedness in favor of the defendant.

Davis contends the prosecutor's arguments are presumably based on studies not in evidence. In *Brooks,* the prosecutor was permitted to argue that the increasing crime rate had been produced by the state's failure to have executed anyone in recent years. Reference to the increasing crime rate was permissible without statistical proof, because such information was within the common knowledge of jurors. Implicit within the state legislature's decision to enact a death penalty statute is the determination that the death penalty serves valid purposes of deterrence and retribution. Thus, the court in *Brooks* concluded that: "[t]he prosecutor need not adduce evidence ... to prove the link between death and deterrence. An argument ... urging jurors to consider the deterrent effect of the penalty is not improper." *Brooks,* 762 F.2d at 1409.

■ Retribution is also a permissible factor which the jury may consider in imposing death. *Brooks,* 762 F.2d at 1407; *Tucker*, 762 F.2d at 1484; *Tucker*, 762 F.2d at 1505. The prosecutor's arguments seeking to justify the execution of Freddie Davis based upon society's legitimate interest of purging itself of this wrong was a permissible argument. The prosecutor made the following argument:

But, by feeling sorry for him, we neglect and overlook another aspect of the case. We completely ignore and neglect and overlook what happened to Miss Coe. What happened to her? For 35 or 40 minutes these people were in her house in which she was undergoing tortures that we can't imagine. We can't imagine what happened to her. No one within his wildest dreams can imagine what she went through. This type of sympathy directed toward Freddie Davis, ladies and gentlemen is false sympathy because it only looks at one side of the coin. One side of the story. To ignore Frances Coe and feel only for this defendant, I submit, would be a disgrace and an injustice and an outrage. That people can commit crimes like this in this country and not receive the punishment that they deserve is a disgrace and an outrage. Something this whole country has to be ashamed of, and ladies and gentlemen, I submit one of the main reasons that we have so many crimes like this in this country and we have them because of sympathy on the part of jurors toward people who commit the crime.

This argument was merely an effective means of emphasizing the purposes of retribution and deterrence served by this statute. The prosecutor also invoked both general and specific deterrence again in his conclusion:

The death penalty is called for. Ask yourselves this question, how would you feel living in this community if you looked out of your window one night and saw Freddie Davis walking down the street coming up toward your house. If that wouldn't put a feeling of cold terror in your heart, what would?

One thing and one thing only will stop or reduce this type of crime from happening is that jurors must do their duty and stand up and be counted and tell Freddie Davis and people like him that they have had enough. That we are going to execute you if you participate in crimes like this. If you don't do it, why should they ever stop doing it? Why should they? If you are not willing to impose the death penalty in this case or cases like this, what will ever stop these people from committing these types of horrible, unspeakable crimes.

In *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the Supreme Court held that the future dangerousness

of a defendant is a proper consideration in imposing death. *See Tucker,* 762 F.2d at 1507; *Bowen v. Kemp,* 769 F.2d 672, 679 (11th Cir.1985). In the above quoted excerpt, the prosecutor dramatically illustrated this future dangerousness. In *Brooks,* the prosecutor brought this very matter home to the jury by asking, "Who's daughter will be killed next?" We found such an argument to be constitutional, concluding that: "A legitimate future dangerousness argument is not rendered improper merely because the prosecutor refers to possible victims." *Brooks,* 762 F.2d at 1412. The argument made in this case is no more emotion laden than the imagery created by the prosecutor in *Brooks.*

▉ Davis also attacks two portions of the prosecutor's arguments which he argues tend to lessen the jury's role in the sentencing process. The prosecutor argued:

This is an important task. It's a task that only the jury can decide. This is a task, a decision, that is so important that only the people, the people themselves, can decide this. The people decide this in the person of your twelve citizens picked from this county, twelve upstanding, intelligent citizens, as the law requires and decide what you think should be done. Punishment can't be decided by the Sheriff. You can't blame him if the person doesn't get the electric chair. You can't blame the judge if he doesn't give him the electric chair, you can't blame the District Attorney or the Governor or the GBI. The Governor doesn't sentence, nor the State Legislature or the State Appeal Court or anybody else. This decision, what a sentence will be, is to be decided by a jury and only be decided by you, by this jury.

A similar argument was made toward the conclusion of the prosecutor's argument:

What this case comes down to is a question of duty. You must do your duty as you see fit as the citizens of this country. And I—this is a difficult thing to do at times. Everyone else has had a duty in this case. The other people have done their duty as well as they saw fit. The citizens who found Miss Coe, found

her body, they did their duty by bringing this to light. The officers, GBI, the Sheriff's office, Sheriff Branch, Mr. Bert Davis, they did their duty as well as it could be done, and we are very fortunate, ladies and gentlemen, to have people like this working for you. I think you realize that. All the witnesses who testified in the case, officers, or people reported the crime or Crime Lab—the Crime Lab did its duty and they did their duty by performing the tests that they did and coming and testifying about it. The Grand Jury did its duty by returning an indictment. The Judge did his duty deciding on the legal points that came up and with intelligence. The juries—first jury did its duty by finding this one guilty of the offenses that he committed. I have attempted to do my duty by trying to bring the truth out to you and let you know what happened. It's your duty and nobody else's you can't delegate it to anyone else. No one else but you and your duty is clear, and to not find—not recommend the death penalty is to leave your duty undone and only halfway complete this case.

These arguments bear some resemblance to an argument made by the prosecutor in *Tucker v. Kemp,* 762 F.2d 1480 (11th Cir. 1985):

[The defense attorney will] mention that, well, can you sleep well if this man is executed? Won't it bother you if you ever read about it or hear about it whenever it happens? But I for one want to tell you that you are not the ones who did it if he is executed. It does not rest on your shoulders, ladies and gentlemen. Policemen did their duty and they went out and made the case. The grand jury down there did its duty and it indicted him and charged him with these horrible offenses. The district attorney's office prosecuted the case, located the witnesses, and brought them in. The judge, the court came in and presided at the trial. And ladies and gentlemen, you are the last link in this thing, and if this man suffers the death penalty it's no more up to you than it is to anybody else, the

grand jury or the police, or the district attorney's office. All of us are coming in and doing our duty.

In *Tucker*, the Court concluded that such an argument was improper because it "suggest[ed] that the jury is only the last link in a long decision" to impose death and therefore trivializes the jury's importance. *Tucker*, 762 F.2d at 1485–86.

In *Brooks v. Kemp*, the en banc court also considered a prosecutor's argument which is remarkably similar to the argument made in the present case:

> Now I'm sure another question that might be going through your mind at this time is, when I get back to that jury room, and we have to vote, and I vote to take somebody's life, can I do it? I know it's rough, it would be hard for me to do. Can I take somebody's life? Well the truth, you're not pulling the switch in the electric chair; the police who investigated this case and who apprehended William Brooks, they're not taking his life; the Recorder's Court Judge who heard the evidence in the preliminary hearing, are you going to say he's responsible for taking his life? Of course not. How about the Grand Jury who listened to the evidence and indicted him for murder; are the Grand Jurors responsible for his life, can you say they're about to take his life? Of course not. How about me and my staff, we put the case together and we prosecuted him, and we're here now asking you to bring back the death penalty, do we feel responsible? I don't. I don't think anybody in my office does. How about the man, if he's electrocuted, who actually pulls the switch, is he responsible for taking his life? Of course not. The person who is responsible for his life is William Brooks himself, and if the switch is pulled and he's put to death, he pulled the switch the morning that he was walking along Saint Mary's Road when he put the gun in the back of Carol Jeannine Galloway and kidnapped her, that's when he took his own life. He's a grown man, and he knew what he was doing.

This argument was found to be proper because it did not minimize the role of the jury as the prosecutor had sought to do in *Tucker*, rather the argument emphasized the responsibility of the jury. In the present case, the prosecutor's arguments are more closely analogous to the argument made in *Brooks* rather than the argument used by the prosecutor in *Tucker*. Here, the jury was instructed as to the importance of its task. The prosecutor informed the jury that they alone could determine the appropriate sentence and that this task could not be delegated.

In *Dutton v. Brown*, 788 F.2d 669, 675 (10th Cir.1986) the United States Court of Appeals for the Tenth Circuit considered a prosecutor's argument which informed the jury that they were not "functioning as individuals" but functioning as part of the legal system in the same manner that the judge and district attorney performed their roles within this system. The court held that such an argument did not diminish the jury's responsibility:

> [T]he statement of the prosecutor was not constitutionally impermissible. The statement was not designed to, nor did it, suggest to the jury that it was not ultimately responsible for deciding [the defendant's] punishment. The prosecutor merely underscored that the jury was part of the whole system of justice, and within that system it had a grave responsibility.

The same must be said concerning the arguments delivered in this case. It certainly was not improper for the prosecutor to argue that the jury should return a verdict of death in this particular case. Accordingly, the argument by the prosecutor in this case was proper.

Finally, even if we were to find the prosecutor's argument to be improper, Davis' sentencing proceeding was not rendered fundamentally unfair. In *Tucker v. Kemp*, 762 F.2d 1480 (11th Cir.1985), the court concluded that the prosecutor's "last link" argument was improper but proceeded to find the argument was not so egregious as to create a constitutional error. The decision in *Tucker*, however, was vacated and remanded by the Supreme Court in light of

the Supreme Court's subsequent decision in Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In Caldwell, the court reversed a death sentence where the jury was informed that a sentence of death is not final and the sentence would be subject to automatic review by the State Supreme Court. In so ruling, the Court, per Justice Marshall, wrote:

> In this case, the state sought to minimize the jury's sense of responsibility for determining the appropriateness of death. Because we cannot say that this effort had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eight Amendment requires.

Id., 105 S.Ct. at 2646. On remand, the Tucker court concluded that its previous holding was consistent with Caldwell. Tucker v. Kemp, 802 F.2d 1293 (11th Cir. 1986) (en banc), cert. denied, — U.S. —, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987). The court noted that "[v]iewing the entire sentencing proceeding, there can be little doubt that the jury understood it had the sole responsibility to determine the sentence to be received by petitioner." Id. at 1296; see also Coleman v. Brown, 802 F.2d 1227, 1238 (10th Cir.1986) ("[W]e do not find that this 'last link' remark made during the guilt stage of the trial—even taken together with the prosecutor's persistent attempts to evoke sympathy for [the] victims and his comments on matters not in evidence—rose to the level of constitutional error."). In the present case, the prosecutor's closing arguments repeatedly emphasized the role played by the jury. The prosecutor began by informing the jury that only they could impose death. Later in his argument, the prosecutor commented:

> If you think that the aggravated circumstances are there, but you think he should get life, then, that's your prerogative and you can give him life. It's totally your decision.

Defense counsel began his arguments by commenting upon the "very awesome responsibility" to which the prosecutor had referred. Furthermore, the judge informed the jury it had the discretion of imposing life even if the statutory aggravating factors were proven beyond a reasonable doubt. In light of these circumstances, we conclude that "the jury was fully apprised of and appreciated the decision that it alone had to make—whether to impose a sentence of death or one of life imprisonment." Tucker, 802 F.2d at 1297. The sentencing proceeding was not fundamentally unfair.

### III

Davis argues that, given the facts and procedural posture of his case, he should not have been put on trial again for his life. He contends that the evidence produced at his guilt/innocence trial failed to demonstrate beyond a reasonable doubt that he committed the offense of rape. At Davis' first sentencing hearing, the state relied on only the subsection (b)(2) aggravating circumstance—murder committed in connection with the rape. Thus, Davis argues that the state could not resentence him to death after his first sentencing hearing because, given the lack of evidence to prove the rape, the double jeopardy clause bars placing him again on trial for his life. See Bullington v. Missouri, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). We will consider the constitutional validity of both his rape conviction and his resentencing together.[6]

When a habeas petitioner raises a sufficiency of the evidence claim, "the relevant question is whether, after viewing the evi-

---

**6.** The state contends that Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), bars Davis from raising these claims. The Wainwright cause and prejudice standard does not apply when the state court passes on an issue and does not enforce its procedural bar. See, e.g., Cooper v. Wainwright, 807 F.2d 881, 886–87 (11th Cir.1986); Booker v. Wainwright, 703 F.2d 1251, 1255 (11th Cir.), cert. denied, 464 U.S. 922, 104 S.Ct. 290, 78 L.Ed.2d 266 (1983); Grizzell v. Wainwright, 692 F.2d 722, 725 (11th Cir.1982), cert. denied, 461 U.S. 948, 103 S.Ct. 2129, 77 L.Ed.2d 1307 (1983). In this case, the state supreme court passed on these issues in its review of Davis' sentence, see Davis v. State, 242 Ga. 901, 252 S.E.2d 443 (1979); therefore, we are free to address the issues on the merits.

dence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). At trial, the state produced evidence that the victim had been forcibly assaulted around the vaginal area. Although the medical examiner testified that he found no sperm and only trace elements of seminal fluid, the position of the victim's body—sweater open, slip pulled up, pantyhose and panties pulled down—was entirely consistent with the jury's conclusion that a rape occurred. Davis argues that the injury could have been accomplished with a foreign object such as a stick. Although this may be true, a reasonable juror could have found beyond a reasonable doubt that the victim was raped.

Davis argues that, although a juror could conclude that the victim was raped, the state introduced no evidence tending to show that Davis, as opposed to his co-defendant Spraggins (who was tried separately), committed the crime. We agree that the state failed to exclude all doubt that Davis, as a principal, committed the rape himself; however, the evidence clearly placed him in the victim's house at the time of the crime. Although both Davis and Spraggins testified that the victim was not raped (assertions controverted by the evidence), Spraggins testified that Davis was not only present during the crime but that Davis instructed Spraggins as to how next to torture and kill the victim. Davis had a cut on his hand; and blood matching Davis' blood type, but not Spraggins', was found in the victim's bedroom and in other portions of the house. Given this evidence, the jury properly could decide that either Davis or Spraggins raped the victim and that the other participated as an aider and abetter, thus making him guilty as a principal under O.C.G.A. § 16–2–20.[7] The judge gave the appropriate jury charge. Thus, we reject both Davis' contention that his rape conviction lacks validity and his contention that the invalidity voids his death sentence.

## IV

■ In a somewhat related claim, Davis next argues that the double jeopardy clause, as construed in *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), prevents the state from relying on an aggravating circumstance to support his death sentence at his second sentencing hearing (the subsection (b)(7) circumstance) not relied on at his first sentencing hearing.[8] Davis is not entitled to relief on this claim. The recent Supreme Court decision in *Poland v. Arizona*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986), disposes of this issue.

In *Poland*, the trial judge had found as an aggravating factor that the murder was "especially heinous, cruel, or depraved," and imposed a sentence of death. The judge, however, concluded that the crime did not fall within the "pecuniary gain" aggravating circumstance because the murder was not a contract killing. The Arizona Supreme Court found the evidence insufficient to support a finding that the murder was especially heinous; the court,

---

7. The statute provides:

(a) Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime.

(b) A person is concerned in the commission of a crime only if he:

(1) Directly commits the crime;

(2) Intentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity;

(3) Intentionally aids or abets in the commission of the crime; or

(4) Intentionally advises, encourages, hires, counsels, or procures another to commit the crime.

O.C.G.A. § 16–2–20.

8. The Court in *Bullington* did not so hold. In that case, the jury refused to impose the death sentence at the first sentencing hearing; thus, the Court held that the state could not attempt again to sentence the defendant to death when he obtained a new trial on the question of his guilt or innocence. *Bullington*, 451 U.S. at 447, 101 S.Ct. at 1862.

however, concluded that the trial judge could have found that the crime was committed for pecuniary gain. At Poland's second sentencing, the prosecution presented additional evidence as to the "especially heinous" and "pecuniary gain" aggravating factors. The prosecutor also introduced evidence concerning a third aggravating circumstance—conviction of a previous violent felony. At the second sentencing, the trial judge found all three aggravating circumstances present and resentenced Poland to death. The Supreme Court held that the reimposition of the death penalty was not precluded by the Double Jeopardy Clause. Concluding that the defendant had never been "acquitted" of the death penalty, the court noted that the prosecutor was writing upon a "clean slate" in seeking a sentence of death at the second sentence hearing. The Supreme Court stated:

> We reject the fundamental premise of petitioners' argument, namely, that a capital sentencer's failure to find a particular aggravating circumstance alleged by the prosecution always constitutes an "acquittal" of that circumstance for double jeopardy purposes. *Bullington* indicates that the proper inquiry is whether the sentencer or reviewing court has "decided that the prosecution has not proved its case" *that the death penalty is appropriate*. We are not prepared to extend *Bullington* further and view the capital sentencing hearing as a set of mini-trials on the existence of each aggravating circumstance. Such an approach would push the analogy on which *Bullington* is based past the breaking point.
>
> Aggravating circumstances are not separate penalties or offenses, but are "standards to guide the making of [the] choice" between the alternative verdicts of death and life imprisonment. *Id.* at 438, 101 S.Ct., at 1858. Thus, under Arizona's capital sentencing scheme, the judge's finding of any particular aggravating circumstance does not of itself "convict" a defendant (*i.e.*, require the death penalty), and the failure to find any particular aggravating circumstance

does not "acquit" a defendant (*i.e.*, preclude the death penalty).

> It is true that the sentencer must find *some* aggravating circumstance before the death penalty may be imposed, and that the sentencer's finding, albeit erroneous, that no aggravating circumstance is present is an "acquittal" barring a second death sentence proceeding. *Arizona v. Rumsey*, [467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984).] [The] concern with protecting the finality of acquittals is not implicated when, as in this case, a defendant is sentenced to death, *i.e.*, "convicted." There is no cause to shield such a defendant from further litigation; further litigation is the only hope he has.

Davis has at no time been "acquitted" of the death penalty. Therefore, at his second sentencing hearing, the prosecution was free to introduce any and all aggravating circumstances supported by the evidence.

## V

At Davis' second hearing, the jury found the aggravating circumstance that the crime was "outrageously or wantonly vile, or an aggravated battery to the victim." O.C.G.A. § 17–10–30(b)(7). Davis contends that application of the (b)(7) circumstance in this case is unconstitutional under *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), because the trial judge failed to give a limiting instruction to the jury and because the facts of this case do not provide a basis for distinguishing this murder from any other murder on the basis of subsection (b)(7). Both arguments are without merit.

We have previously rejected the contention that the trial judge must give a limiting instruction. *Westbrook v. Zant*, 704 F.2d 1487, 1504 (11th Cir.1983); *Stanley v. Zant*, 697 F.2d 955, 971 (11th Cir.1983). In this case, as in *Stanley*, the instruction directed the jury that they must find that the murder involved "torture, depravity of mind on the part of the defendant *and* aggravated battery on the defendant

[sic]." [9] *Cf. Stanley,* 697 F.2d at 971–72. Thus, there is not a possibility here, as there was in *Godfrey,* that "the jury [might] find depravity of the mind even absent any serious physical abuse of the victim before death." *Id.* at 971. Davis thus has no basis for a faulty-instruction claim absent a requirement for a limiting instruction.

 Given the review conducted by the Georgia Supreme Court, however, we would uphold application of the circumstance in this case even if the instruction had been stated in the disjunctive.[10] As we noted in *Westbrook,* "the *Godfrey* plurality intimated that the uncontrolled discretion of an uninstructed jury could be cured by review in the Georgia Supreme Court." 704 F.2d at 1504. The Georgia Supreme Court analyzed the application of the (b)(7) circumstance in this case as follows:

> Pursuant to the mandate of the Supreme Court of the United States we have considered both appellant Spraggins' sentence of death which rests upon Code Ann. § 27–2534.1(b)(7) and Davis' sentence of death which rests partially upon Code Ann. § 27–2534.1(b)(7). We find material differences between Godfrey and the cases under review which distinguish this murder from the murder in Godfrey and from other "ordinary murders" for which the death penalty is not appropriate. See generally, *Hance v. State,* 245 Ga. 856 (268 S.E.2d 339) (1980); *Dampier v. State,* addendum, 245 Ga. 882 (268 S.E.2d 349) (1980).

> Unlike the murder in Godfrey, death was not instantaneous, the victim was not related to either defendant, and the victim was in no way threatening or hostile to the defendants. Both defendants had planned to rob the victim. Thereafter the defendants fled and made every effort to conceal their crimes.

> Code Ann. § 27–2534.1(b)(7) provides in pertinent part: "The offense of murder . . . was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." In *Davis v. State,* supra, and *Spraggins v. State,* supra, we held that the jury's finding beyond a reasonable doubt that the "murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind of the defendant or aggravated battery to the victim" was supported by the evidence.

> The evidence shows that the victim was raped and killed as part of a robbery scheme. The victim died from loss of blood. She had been beaten about the face and had been repeatedly stabbed, slashed and cut. Her throat was cut and the trachea was almost severed. She had been partially disemboweled. Death was not instantaneous but was prolonged. *Spraggins v. State,* 240 Ga. 759, 243 S.E.2d 20 (1978).

> The victim was found with her sweater open, her slip pulled up and her pantyhose and panties pulled down. Forensic evidence established that there could have been manipulation of the victim's sexual organs. Bruises were present on her thigh and near the vaginal opening. There was a tear in the vaginal wall and hemorrhaging around the uretha.

> Torture occurs when the victim is subjected to serious physical abuse before death. *Godfrey v. Georgia,* supra; *Hance v. State* supra. Serious sexual abuse may be found to constitute serious physical abuse, *House v. State,* 232 Ga. 140, 205 S.E.2d 217 (1974); *Hance v. State,* supra. A defendant who tortures the victim before killing the victim can be found to have a depraved mind.

> A defendant who mutilates or seriously disfigures the victim's body after death may be found to have a depraved mind and such acts would be sufficient to show depravity of mind of the defendant within the meaning of Code Ann. § 27–2534.1(b)(7). *Hance v. State,* supra.

---

**9.** The inadvertent misstatement in the instruction is clearly harmless.

**10.** There is no merit to Davis' claim that it was unconstitutional for the Georgia Supreme Court to reinstate his death sentence when the United States Supreme Court vacated the Georgia Court's earlier decisions and remanded the case for further consideration in light of *Godfrey.*

Accordingly, this court holds that juries in both *Spraggins v. State,* supra, and *Davis v. State,* supra, were authorized to find, consistently with the United States Supreme Court's holding in Godfrey, that beyond a reasonable doubt the murder of the victim was of the type universally condemned by civilized society as "outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind." See *Burger v. State,* 245 Ga. 458, 265 S.E.2d 796 (1980); *Stevens v. State,* 245 Ga. 583, 266 S.E.2d 194 (1980).

*Davis v. State,* 246 Ga. 432, 433–34, 271 S.E.2d 828, 830 (1980) (footnote omitted). As the opinion of the Georgia Supreme Court aptly demonstrates, the imposition of the death penalty on the basis of the (b)(7) circumstance does not violate the Constitution in this case.

### VI

■ Davis also raises several claims attacking the validity of his murder conviction. Davis first contends that the state trial judge violated the rule set forth in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), by failing to exclude from evidence at the trial three statements Davis made to the police. Davis and his father voluntarily went to the police station at 1:30 a.m. on February 1, 1977. The police did not read Davis his *Miranda* warnings, and Davis made a statement. On February 2, 1977, the police picked up Davis at his place of employment and took him to the police station. Again he made a statement without benefit of his *Miranda* warnings. Davis made the third statement in issue after his arrest.

Davis' contentions concerning the third statement can be quickly decided. At trial, in a *Jackson-Denno* hearing,[11] a police officer testified that he read Davis his *Miranda* rights before Davis made the third statement. Davis did not testify. The trial judge allowed the statement to be admitted on the basis of the officer's testimony. We find no reason now to question his decision, which is a finding of historical fact. *See*

*Goodwin v. Balkcom,* 684 F.2d 794 (11th Cir.1982), *cert. denied,* 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983); 28 U.S.C. § 2254(d) (1982).

Respondent Kemp admits that Davis made the first and second statements without receiving *Miranda* warnings. We must therefore decide whether Davis was in custody at the time he made the statements; if so, the trial judge should not have admitted the statements at trial. This circuit follows a four factor test in making such a determination. We consider: (1) whether probable cause to arrest was present; (2) the subjective intent of the officers conducting the interrogation (whether they believed Davis was free to leave); (3) the subjective belief of the defendant concerning his freedom to leave; and (4) whether the investigation had focused on the defendant. *United States v. Jordan,* 557 F.2d 1081, 1083 (5th Cir.1977).

As to the first statement, Davis clearly was not in custody. He voluntarily came to the police station. *See Sullivan v. Alabama,* 666 F.2d 478, 480–81 (11th Cir.1982). There is no indication that he was under suspicion for the crime, that he or the police believed that he would be detained, or that the investigation had focused on him. The district judge also correctly held that the second interrogation was not custodial. At the trial hearing, Davis' counsel did not suggest that the officer had probable cause to arrest Davis, and Davis did not testify that he believed himself not free to leave. There is no indication that the police had the intention of doing more than following up on Davis' previous statements. They freely released Davis at the end of the hearing on his promise that he would post a bond as a material witness. From this, we infer that the state's interest in Davis was not as a prospective defendant but as a prospective witness and that Davis had no reason to believe that he was in custody.

### VII

■ Davis next contends that certain portions of the prosecutor's argument

---

11. Davis does not argue that he did not receive a full and fair hearing.

at the guilt/innocence phase of his trial rendered that proceeding fundamentally unfair. The prosecutor argued that the jurors should find Davis guilty of both rape and murder in order to preserve their chance to sentence Davis to death at the sentencing hearing.[12] (In the first sentencing hearing, the state relied on no aggravating factors except murder in the course of the rape. *See supra* § III). The prosecutor also argued that the state medical examiner, who testified concerning the evidence suggesting rape, must have believed that the victim was raped or he would not have taken the stand.[13] Finally, the prosecutor supported his argument that the jury should convict Davis by suggesting that they imagine looking out their windows and seeing him approach their houses at night.[14]

We agree with Davis that these arguments may well violate section 5.8 of the ABA Standards on the Administration of Criminal Justice. The statements did not, however, render Davis' trial fundamentally unfair. *See Darden v. Wainwright*, 477 U.S. 187, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Houston v. Estelle*, 569 F.2d 372 (5th Cir.1978). The comments by the prosecutor concerning the rape conviction were accurate though they were improper. This is not a case, such as *Houston*, in which the prosecutor's comments were grossly unfair and overreaching. It also is not a case "in which the prosecutor's remarks so prejudiced a specific right, such as the privilege against compulsory self-incrimination, as to amount to a denial of that right." *Donnelly*, 416 U.S. at 637, 94 S.Ct. at 1868 (citations omitted). We sit as a federal court considering a state criminal trial in the context of a habeas corpus proceeding. As such, we may not impose the standards authorized by our supervisory power that have developed in federal criminal cases. *Houston*, 569 F.2d at 380. Mindful of these limits, we reject Davis' argument.

### VIII

Davis next contends that his trial counsel, Ted Schumacher, failed to provide him

12. The prosecutor made the following statement during his opening argument after both the state and the defense had rested:

If you find the Defendant not guilty on both Counts, the man walks out of here back into your community. If you find him guilty of one Count, that Count being Murder, he will automatically receive a life sentence, that is, if he's found guilty only of that count. If he's found guilty of Rape, and not guilty of Murder, the judge will sentence him. He can receive a sentence from one year to life. If you find him guilty on both Counts, then additional evidence and argument will be presented to you to determine whether he should receive the death penalty or not. This additional evidence can be presented only if you find him guilty on both Counts.

After defense counsel had completed his closing argument, the prosecutor again reminded the jury of their role in his closing argument as follows:

Now, there is something I want to make clear and I want you to understand that now. At the present stage of the proceedings, you don't have this man's life in your hands. You're only concerned with what you think the evidence, whether you think the evidence shows that he's guilty. Now, you will have to decide whether to impose the sentence of life imprisonment or death, if you find him guilty of both counts only. And of course, if you

find him guilty of both counts, then you will decide whether you'll give him a life sentence or death. You'll make that decision at a later time, you know, provided you find him guilty of both counts here.

13. As excerpted by appellee/cross-appellant Davis, the prosecutor argued as follows:

Dr. Dawson is totally objective. He doesn't know the Defendant. He knows nothing. He looks at this from [a] cold, scientific, objective standpoint.... There's one thing for sure. These folks at the Crime Lab know what they're talking about.... Evidence from the Crime Lab often times show [sic] that a person who is accused of a crime, or who is suspected of a crime, is innocent rather than guilty.... If Dr. Dawson did not believe that this woman was raped, he would not be here testifying.

14. The prosecutor argued as follows:

You imagine sitting in your house at night, be you man or woman, by yourself, with your spouse gone, and looking out there and seeing Freddie Davis, or one of his friends heading up to the house? He might have his hand in his pocket reaching for his knife. Can you imagine the feeling of terror that would go through you? Do you want to put him back because he cried on the stand? Because he's young. Because you feel sorry for him.

effective assistance at his guilt/innocence trial and at his second sentencing hearing. As to the trial, Davis first notes that Schumacher had only one week before trial to prepare the case and argues that he did not and could not have adequately prepared. Second, Davis seeks to persuade this court that Schumacher committed a gross mistake by calling Eddie Spraggins to the stand. Spraggins was indicted and convicted in a separate trial for the same murder that Davis was accused of committing. Schumacher called Spraggins, asked him to state his name, and then indicated that he had no further questions. On cross-examination of Spraggins, the state elicited testimony damaging to Davis. Schumacher did not foresee that this problem would arise because he assumed that the judge would limit the prosecutor's questions on cross-examination to the scope of the direct examination; however, this is not the rule in Georgia. As to the sentencing hearing, Davis argues that Schumacher rendered ineffective assistance because he failed to seek out witnesses to call at trial who would have produced evidence mitigating against imposition of the death penalty.

Claims of ineffective assistance of counsel are mixed questions of law and fact. The presumption of correctness under 28 U.S.C. § 2254(d) (1976) applies only to historical facts, not to the finding by the state courts that Davis received effective assistance. *Goodwin v. Balkcom,* 684 F.2d 794 (11th Cir.1982), *cert. denied,* 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983). In analyzing Davis' claims, we are guided principally by the decision of the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), wherein the Court described the test to be applied as follows:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.

Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* 104 S.Ct. at 2064. *See also Stanley v. Zant,* 697 F.2d 955 (11th Cir.1983). Thus, we must determine whether Davis has shown that his counsel did not render "reasonably effective assistance given the totality of the circumstances." *Stanley,* 697 F.2d at 962. In making this determination, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland v. Washington,* 104 S.Ct. at 2066. Further, even if Schumacher's assistance is found to have been ineffective, Davis cannot prevail on his claim unless he can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 2068.

The state habeas court conducted a hearing into Davis' effective assistance claims. Davis has not contested that court's factual findings, and we believe that they clearly lead to the conclusion that, in preparing for the trial, Schumacher conducted an adequate investigation under the circumstances. Davis initially retained counsel to represent him, but, as a result of problems, Schumacher was appointed seven days before the trial. He moved unsuccessfully for a continuance. When it was denied, he conducted a reasonable pretrial investigation. He interviewed Davis, examined the scene of the crime, contacted witnesses and observed the trial of Davis' codefendant. To some extent Schumacher chose to forego filing certain motions and pursuing certain areas of inquiry, but we believe these choices to be reasonable strategic decisions given the time constraints

of the situation. *See id.* at 2066. Because we find Schumacher's assistance in this area effective, we need not decide whether Davis suffered prejudice.

■ The district court conducted a limited hearing concerning Davis' second contention—that Schumacher violated his rights by calling Spraggins to the stand. At the hearing, Schumacher testified that he decided to call Spraggins so the jury could view him. He felt that exhibiting Spraggins' large physical size would support Davis' defense that Spraggins coerced him. We realize that Schumacher could have employed other methods to achieve the same objective; nevertheless, this was a valid strategic decision and cannot be characterized as ineffective assistance. Although Schumacher admitted that he did not know that Georgia does not limit cross-examination to the scope of direct, this does not afford Davis a basis for relief. Schumacher did not afford the state an opportunity to introduce otherwise unavailable evidence. Davis testified on his own behalf, and there is no indication that the state could not have located Spraggins to call as a rebuttal witness. Thus, his counsel did not "allow" the state to introduce evidence that the state could not have introduced in any event. Davis has failed to prove either that he received ineffective assistance, *see Clark v. Blackburn,* 619 F.2d 431, 433 (5th Cir.1980) (defendant not entitled to perfect counsel), or that he suffered prejudice.

■ Schumacher also rendered constitutionally effective assistance at the sentencing hearing. Schumacher did not call any witnesses at the hearing; and according to Davis, he did not conduct an investigation and contact witnesses who could testify to Davis' good character and reputation for truthfulness. Davis produced such witnesses before the district court. We have examined the record and read Schumacher's testimony, however, and we conclude that Schumacher followed the course of action he chose for valid strategic reasons. As we often have stated, an attorney need not conduct an investigation into every avenue of defense possible at trial;

and, when he chooses not to present certain evidence for valid reasons, he need not prepare to present it at trial simply to avoid later a claim such as this one. *See, e.g., Stanley,* 697 F.2d at 969.

Schumacher pursued the following strategy in putting on his case for the evidentiary hearing. First, he knew how damaging Spraggins' testimony had been at the first trial; he therefore decided to attempt to keep Spraggins off the stand. When the state did not have Spraggins testify, he rested his case without putting on evidence in the hope that the trial judge would not allow the state to reopen its case. The judge allowed the state to reopen its case; nevertheless, Schumacher's decision to rest was not unreasonable. Furthermore, an examination of the evidence Davis now contends Schumacher should have offered reveals that it might have done more harm than good. It would have allowed the state to introduce evidence of Davis' bad character—for example, his involvement in a knife fight a few days before the murder. *See, e.g., Easter v. Estelle,* 609 F.2d 756, 759 (5th Cir.1980) (reasonable trial strategy not to introduce evidence that would "open the door" for the state to show defendant's prior conviction).

■ Not only would the evidence have been damaging, it was not necessary for Schumacher to introduce it to establish the points he argued at his rather lengthy, well-considered closing argument. Much of the evidence put on by the state showed that Spraggins had committed the actual killing. Davis' statements to the police, which also placed the blame on Spraggins, were also in evidence; and Schumacher used those in his argument. He attempted to convince the jury that Spraggins was a sex-crazed maniac and primarily responsible for the murders. He was able to do this because, through the use of Davis' statements, he could produce Davis' testimony without actually having Davis take the stand. We have rejected the contention that failure to put on mitigating evidence at a sentencing hearing is *per se* ineffective. *Stanley,* 697 F.2d at 961. Absent such a rule, we cannot conclude that Schu-

macher's assistance violated the Constitution.

The judgment of the district court is therefore AFFIRMED in part and REVERSED in part.